## CALIFORNIA *v.* CIRAOLO

No. 84–1513.   Argued December 10, 1985—Decided May 19, 1986

BURGER, C. J., delivered the opinion of the Court, in which WHITE, REHNQUIST, STEVENS, and O'CONNOR, JJ., joined. POWELL, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and BLACKMUN, JJ., joined, *post*, p. 215.

*Laurence K. Sullivan*, Deputy Attorney General of California, argued the cause for petitioner. With him on the briefs were *John K. Van de Kamp*, Attorney General, *Steve White*, Chief Assistant Attorney General, and *Eugene W. Kaster*, Deputy Attorney General.

*Marshall Warren Krause*, by appointment of the Court, 472 U. S. 1025, argued the cause for respondent. With him on the brief was *Pamela Holmes Duncan.**

*Briefs of *amici curiae* urging reversal were filed for the State of Indiana et al. by *Linley E. Pearson*, Attorney General of Indiana, *William E. Daily* and *Lisa M. Paunicka*, Deputy Attorneys General, *Charles A. Graddick*, Attorney General of Alabama, *Charles M. Oberly*, Attorney General of Delaware, *Michael J. Bowers*, Attorney General of Georgia, *Neil F. Hartigan*, Attorney General of Illinois, *Robert T. Stephan*, Attorney General of Kansas, *David L. Armstrong*, Attorney General of Kentucky, *William J. Guste, Jr.*, Attorney General of Louisiana, *James E. Tierney*, Attorney General of Maine, *Francis X. Bellotti*, Attorney General of Massachusetts, *William L. Webster*, Attorney General of Missouri, *Robert M. Spire*, Attorney General-Designate of Nebraska, *Brian McKay*, Attorney General of Nevada, *Stephen E. Merrill*, Attorney General of New Hampshire, *Paul Bardacke*, Attorney General of New Mexico, *Anthony Celebrezze*, Attorney General of Ohio, *LeRoy S. Zimmerman*, Attorney General of Pennsylvania, *Travis Medlock*, Attorney General of South Carolina, *Jeffrey Amestoy*, Attorney General of Vermont, *Gerald L. Baliles*, Attorney General of Virginia, *Kenneth O. Eikenberry*, Attorney General of Washington, and *Archie G. McClintock*, Attorney General of

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to determine whether the Fourth Amendment is violated by aerial observation without a warrant from an altitude of 1,000 feet of a fenced-in backyard within the curtilage of a home.

I

On September 2, 1982, Santa Clara Police received an anonymous telephone tip that marijuana was growing in respondent's backyard. Police were unable to observe the contents of respondent's yard from ground level because of a 6-foot outer fence and a 10-foot inner fence completely enclosing the yard. Later that day, Officer Shutz, who was assigned to investigate, secured a private plane and flew over respondent's house at an altitude of 1,000 feet, within navigable airspace; he was accompanied by Officer Rodriguez. Both officers were trained in marijuana identification. From the overflight, the officers readily identified marijuana plants 8 feet to 10 feet in height growing in a 15- by 25-foot plot in respondent's yard; they photographed the area with a standard 35mm camera.

On September 8, 1982, Officer Shutz obtained a search warrant on the basis of an affidavit describing the anonymous tip and their observations; a photograph depicting respondent's house, the backyard, and neighboring homes was attached to the affidavit as an exhibit. The warrant was

Wyoming; for Americans for Effective Law Enforcement Inc. et al. by *Fred E. Inbau, Wayne W. Schmidt, James P. Manak, David Crump,* and *Daniel B. Hales;* for the Criminal Justice Legal Foundation by *Christopher N. Heard;* and for the Washington Legal Foundation by *Daniel J. Popeo* and *George C. Smith.*

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *C. Douglas Floyd, Alan L. Schlosser,* and *Charles S. Sims;* for the Civil Liberties Monitoring Project by *Amitai Schwartz;* and for the National Association of Criminal Defense Lawyers by *John Kenneth Zwerling.*

executed the next day and 73 plants were seized; it is not disputed that these were marijuana.

After the trial court denied respondent's motion to suppress the evidence of the search, respondent pleaded guilty to a charge of cultivation of marijuana. The California Court of Appeal reversed, however, on the ground that the warrantless aerial *observation* of respondent's yard which led to the issuance of the warrant violated the Fourth Amendment. 161 Cal. App. 3d 1081, 208 Cal. Rptr. 93 (1984). That court held first that respondent's backyard marijuana garden was within the "curtilage" of his home, under *Oliver* v. *United States*, 466 U. S. 170 (1984). The court emphasized that the height and existence of the two fences constituted "objective criteria from which we may conclude he manifested a reasonable expectation of privacy by any standard." 161 Cal. App. 3d, at 1089, 208 Cal. Rptr., at 97.

Examining the particular method of surveillance undertaken, the court then found it "significant" that the flyover "was not the result of a routine patrol conducted for any other legitimate law enforcement or public safety objective, but was undertaken for the specific purpose of observing this particular enclosure within [respondent's] curtilage." *Ibid.* It held this focused observation was "a direct and unauthorized intrusion into the sanctity of the home" which violated respondent's reasonable expectation of privacy. *Id.*, at 1089–1090, 208 Cal. Rptr., at 98 (footnote omitted). The California Supreme Court denied the State's petition for review.

We granted the State's petition for certiorari, 471 U. S. 1134 (1985). We reverse.

The State argues that respondent has "knowingly exposed" his backyard to aerial observation, because all that was seen was visible to the naked eye from any aircraft flying overhead. The State analogizes its mode of observation to a knothole or opening in a fence: if there is an opening, the police may look.

The California Court of Appeal, as we noted earlier, accepted the analysis that unlike the casual observation of a private person flying overhead, this flight was focused specifically on a small suburban yard, and was not the result of any routine patrol overflight. Respondent contends he has done all that can reasonably be expected to tell the world he wishes to maintain the privacy of his garden within the curtilage without covering his yard. Such covering, he argues, would defeat its purpose as an outside living area; he asserts he has not "knowingly" exposed himself to aerial views.

## II

The touchstone of Fourth Amendment analysis is whether a person has a "constitutionally protected reasonable expectation of privacy." *Katz* v. *United States*, 389 U. S. 347, 360 (1967) (Harlan, J., concurring). *Katz* posits a two-part inquiry: first, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable? See *Smith* v. *Maryland*, 442 U. S. 735, 740 (1979).

Clearly—and understandably—respondent has met the test of manifesting his own subjective intent and desire to maintain privacy as to his unlawful agricultural pursuits. However, we need not address that issue, for the State has not challenged the finding of the California Court of Appeal that respondent had such an expectation. It can reasonably be assumed that the 10-foot fence was placed to conceal the marijuana crop from at least street-level views. So far as the normal sidewalk traffic was concerned, this fence served that purpose, because respondent "took normal precautions to maintain his privacy." *Rawlings* v. *Kentucky*, 448 U. S. 98, 105 (1980).

Yet a 10-foot fence might not shield these plants from the eyes of a citizen or a policeman perched on the top of a truck or a two-level bus. Whether respondent therefore manifested

a subjective expectation of privacy from *all* observations of his backyard, or whether instead he manifested merely a hope that no one would observe his unlawful gardening pursuits, is not entirely clear in these circumstances. Respondent appears to challenge the authority of government to observe his activity from any vantage point or place if the viewing is motivated by a law enforcement purpose, and not the result of a casual, accidental observation.

We turn, therefore, to the second inquiry under *Katz, i. e.*, whether that expectation is reasonable. In pursuing this inquiry, we must keep in mind that "[t]he test of legitimacy is not whether the individual chooses to conceal assertedly 'private' activity," but instead "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." *Oliver, supra,* at 181–183.

Respondent argues that because his yard was in the curtilage of his home, no governmental aerial observation is permissible under the Fourth Amendment without a warrant.[1] The history and genesis of the curtilage doctrine are instructive. "At common law, the curtilage is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" *Oliver, supra,* at 180 (quoting *Boyd* v. *United States*, 116 U. S. 616, 630 (1886)). See 4 Blackstone, Commentaries *225. The

---

[1] Because the parties framed the issue in the California courts below and in this Court as concerning only the reasonableness of aerial observation generally, see Pet. for Cert. i, without raising any distinct issue as to the photograph attached as an exhibit to the affidavit in support of the search warrant, our analysis is similarly circumscribed. It was the officer's observation, not the photograph, that supported the warrant. Officer Shutz testified that the photograph did not identify the marijuana as such because it failed to reveal a "true representation" of the color of the plants: "you have to see it with the naked eye." App. 36.

protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened. The claimed area here was immediately adjacent to a suburban home, surrounded by high double fences. This close nexus to the home would appear to encompass this small area within the curtilage. Accepting, as the State does, that this yard and its crop fall within the curtilage, the question remains whether naked-eye observation of the curtilage by police from an aircraft lawfully operating at an altitude of 1,000 feet violates an expectation of privacy that is reasonable.

That the area is within the curtilage does not itself bar all police observation. The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares. Nor does the mere fact that an individual has taken measures to restrict some views of his activities preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible. *E. g.*, *United States* v. *Knotts*, 460 U. S. 276, 282 (1983). "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz, supra,* at 351.

The observations by Officers Shutz and Rodriguez in this case took place within public navigable airspace, see 49 U. S. C. App. § 1304, in a physically nonintrusive manner; from this point they were able to observe plants readily discernible to the naked eye as marijuana. That the observation from aircraft was directed at identifying the plants and the officers were trained to recognize marijuana is irrelevant. Such observation is precisely what a judicial officer needs to provide a basis for a warrant. Any member of the public flying in this airspace who glanced down could have seen

everything that these officers observed. On this record, we readily conclude that respondent's expectation that his garden was protected from such observation is unreasonable and is not an expectation that society is prepared to honor.[2]

The dissent contends that the Court ignores Justice Harlan's warning in his concurrence in *Katz* v. *United States*, 389 U. S., at 361–362, that the Fourth Amendment should not be limited to proscribing only physical intrusions onto private property. *Post*, at 215–216. But Justice Harlan's observations about future electronic developments and the potential for electronic interference with private communications, see *Katz*, *supra*, at 362, were plainly not aimed at simple visual observations from a public place. Indeed, since *Katz* the Court has required warrants for electronic surveillance aimed at intercepting private conversations. See *United States* v. *United States District Court*, 407 U. S. 297 (1972).

Justice Harlan made it crystal clear that he was resting on the reality that one who enters a telephone booth is entitled to assume that his conversation is not being intercepted. This does not translate readily into a rule of constitutional dimensions that one who grows illicit drugs in his backyard is "entitled to assume" his unlawful conduct will not be ob-

---

[2] The California Court of Appeal recognized that police have the right to use navigable airspace, but made a pointed distinction between police aircraft focusing on a particular home and police aircraft engaged in a "routine patrol." It concluded that the officers' "focused" observations violated respondent's reasonable expectations of privacy. In short, that court concluded that a regular police patrol plane identifying respondent's marijuana would lead to a different result. Whether this is a rational distinction is hardly relevant, although we find difficulty understanding exactly how respondent's expectations of privacy from aerial observation might differ when two airplanes pass overhead at identical altitudes, simply for different purposes. We are cited to no authority for this novel analysis or the conclusion it begat. The fact that a ground-level observation by police "focused" on a particular place is not different from a "focused" aerial observation under the Fourth Amendment.

served by a passing aircraft—or by a power company repair mechanic on a pole overlooking the yard. As Justice Harlan emphasized,

> "a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the 'plain view' of outsiders are not 'protected' because no intention to keep them to himself has been exhibited. On the other hand, conversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable." *Katz, supra,* at 361.

One can reasonably doubt that in 1967 Justice Harlan considered an aircraft within the category of future "electronic" developments that could stealthily intrude upon an individual's privacy. In an age where private and commercial flight in the public airways is routine, it is unreasonable for respondent to expect that his marijuana plants were constitutionally protected from being observed with the naked eye from an altitude of 1,000 feet. The Fourth Amendment simply does not require the police traveling in the public airways at this altitude to obtain a warrant in order to observe what is visible to the naked eye.[3]

*Reversed.*

JUSTICE POWELL, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE BLACKMUN join, dissenting.

Concurring in *Katz* v. *United States,* 389 U. S. 347 (1967), Justice Harlan warned that any decision to construe the

---

[3] In *Dow Chemical Co.* v. *United States, post,* p. 227, decided today, we hold that the use of an aerial mapping camera to photograph an industrial manufacturing complex from navigable airspace similarly does not require a warrant under the Fourth Amendment. The State acknowledges that "[a]erial observation of curtilage may become invasive, either due to physical intrusiveness or through modern technology which discloses to the senses those intimate associations, objects or activities otherwise imperceptible to police or fellow citizens." Brief for Petitioner 14–15.

Fourth Amendment as proscribing only physical intrusions by police onto private property "is, in the present day, bad physics as well as bad law, for reasonable expectations of privacy may be defeated by electronic as well as physical invasion." *Id.*, at 362. Because the Court today ignores that warning in an opinion that departs significantly from the standard developed in *Katz* for deciding when a Fourth Amendment violation has occurred, I dissent.

## I

As the Court's opinion reflects, the facts of this case are not complicated. Officer Shutz investigated an anonymous report that marijuana was growing in the backyard of respondent's home. A tall fence prevented Shutz from looking into the yard from the street. The yard was directly behind the home so that the home itself furnished one border of the fence. Shutz proceeded, without obtaining a warrant, to charter a plane and fly over the home at an altitude of 1,000 feet. Observing marijuana plants growing in the fenced-in yard, Shutz photographed respondent's home and yard, as well as homes and yards of neighbors. The photograph clearly shows that the enclosed yard also contained a small swimming pool and patio. Shutz then filed an affidavit, to which he attached the photograph, describing the anonymous tip and his aerial observation of the marijuana. A warrant issued,[1] and a search of the yard confirmed Shutz' aerial observations. Respondent was arrested for cultivating marijuana, a felony under California law.

Respondent contends that the police intruded on his constitutionally protected expectation of privacy when they conducted aerial surveillance of his home and photographed his backyard without first obtaining a warrant. The Court

---

[1] The warrant authorized Shutz to search the home and its attached garage, as well as the yard, for marijuana, narcotics paraphernalia, records relating to marijuana sales, and documents identifying the occupant of the premises.

rejects that contention, holding that respondent's expectation of privacy in the curtilage of his home, although reasonable as to intrusions on the ground, was unreasonable as to surveillance from the navigable airspace. In my view, the Court's holding rests on only one obvious fact, namely, that the airspace generally is open to all persons for travel in airplanes. The Court does not explain why this single fact deprives citizens of their privacy interest in outdoor activities in an enclosed curtilage.

## II

### A

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." While the familiar history of the Amendment need not be recounted here,[2] we should remember that it reflects a choice that our society should be one in which citizens "dwell in reasonable security and freedom from surveillance." *Johnson* v. *United States*, 333 U. S. 10, 14 (1948). Since that choice was made by the Framers of the Constitution, our cases construing the Fourth Amendment have relied in part on the common law for instruction on "what sorts of searches the Framers . . . regarded as reasonable." *Steagald* v. *United States*, 451 U. S. 204, 217 (1981). But we have repeatedly refused to freeze "'into constitutional law those enforcement practices that existed at the time of the Fourth Amendment's passage.'" *Id.*, at 217, n. 10, quoting *Payton* v. *New York*, 445 U. S. 573, 591, n. 33 (1980). See *United States* v. *United States District Court*, 407 U. S. 297, 313 (1972). Rather, we have construed the Amendment "'in light of contemporary norms and conditions,'" *Steagald* v. *United States, supra,* at 217, n. 10, quoting *Payton* v. *New York, supra,* at 591, n. 33, in order to prevent "any stealthy encroachments" on our citizens' right to be free of arbitrary official intrusion,

---

[2] See, *e. g., Payton* v. *New York*, 445 U. S. 573, 583–585, n. 20 (1980).

*Boyd* v. *United States,* 116 U. S. 616, 635 (1886). Since the landmark decision in *Katz* v. *United States,* the Court has fulfilled its duty to protect Fourth Amendment rights by asking if police surveillance has intruded on an individual's reasonable expectation of privacy.

As the decision in *Katz* held, and dissenting opinions written by Justices of this Court prior to *Katz* recognized, *e. g., Goldman* v. *United States,* 316 U. S. 129, 139–141 (1942) (Murphy, J., dissenting); *Olmstead* v. *United States,* 277 U. S. 438, 474 (1928) (Brandeis, J., dissenting), a standard that defines a Fourth Amendment "search" by reference to whether police have physically invaded a "constitutionally protected area" provides no real protection against surveillance techniques made possible through technology. Technological advances have enabled police to see people's activities and associations, and to hear their conversations, without being in physical proximity. Moreover, the capability now exists for police to conduct intrusive surveillance without any physical penetration of the walls of homes or other structures that citizens may believe shelters their privacy.[3] Looking to the Fourth Amendment for protection against such "broad and unsuspected governmental incursions" into the "cherished privacy of law-abiding citizens," *United States* v. *United States District Court, supra,* at

---

[3] As was said more than four decades ago: "[T]he search of one's home or office no longer requires physical entry for science has brought forth far more effective devices for the invasion of a person's privacy than the direct and obvious methods of oppression which were detested by our forbears and which inspired the Fourth Amendment. . . . Whether the search of private quarters is accomplished by placing on the outer walls of the sanctum a detectaphone that transmits to the outside listener the intimate details of a private conversation, or by new methods of photography that penetrate walls or overcome distances, the privacy of the citizen is equally invaded by the Government and intimate personal matters are laid bare to view." *Goldman* v. *United States,* 316 U. S. 129, 139 (1942) (Murphy, J., dissenting). Since 1942, science has developed even more sophisticated means of surveillance.

312–313 (footnote omitted), the Court in *Katz* abandoned its inquiry into whether police had committed a physical trespass. *Katz* announced a standard under which the occurrence of a search turned not on the physical position of the police conducting the surveillance, but on whether the surveillance in question had invaded a constitutionally protected reasonable expectation of privacy.

Our decisions following the teaching of *Katz* illustrate that this inquiry "normally embraces two discrete questions." *Smith* v. *Maryland*, 442 U. S. 735, 740 (1979). "The first is whether the individual, by his conduct, has 'exhibited an actual (subjective) expectation of privacy.'" *Ibid.*, quoting *Katz* v. *United States*, 389 U. S., at 361 (Harlan, J., concurring). The second is whether that subjective expectation "is 'one that society is prepared to recognize as "reasonable."'" 442 U. S., at 740, quoting *Katz* v. *United States, supra,* at 361 (Harlan, J., concurring). While the Court today purports to reaffirm this analytical framework, its conclusory rejection of respondent's expectation of privacy in the yard of his residence as one that "is unreasonable," *ante*, at 213, represents a turning away from the principles that have guided our Fourth Amendment inquiry. The Court's rejection of respondent's Fourth Amendment claim is curiously at odds with its purported reaffirmation of the curtilage doctrine, both in this decision and its companion case, *Dow Chemical Co.* v. *United States, post*, p. 227, and particularly with its conclusion in *Dow* that society is prepared to recognize as reasonable expectations of privacy in the curtilage, *post*, at 235.

The second question under *Katz* has been described as asking whether an expectation of privacy is "legitimate in the sense required by the Fourth Amendment."[4] *Oliver* v.

---

[4] In Justice Harlan's classic description, an actual expectation of privacy is entitled to Fourth Amendment protection if it is an expectation that society recognizes as "reasonable." *Katz* v. *United States*, 389 U. S., at 361 (Harlan, J., concurring). Since *Katz*, our decisions also have de-

*United States,* 466 U. S. 170, 182 (1984). The answer turns on "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." *Id.,* at 182–183. While no single consideration has been regarded as dispositive, "the Court has given weight to such factors as the intention of the Framers of the Fourth Amendment, . . . the uses to which the individual has put a location, . . . and our societal understanding that certain areas deserve the most scrupulous protection from government invasion."[5] *Id.,* at 178. Our decisions have made clear that this inquiry often must be decided by "reference to a 'place,'" *Katz* v. *United States, supra,* at 361 (Harlan, J., concurring); see *Payton* v. *New York,* 445 U. S., at 589, and that a home is a place in which a subjective expectation of privacy virtually always will be legitimate, *ibid.;* see, *e. g., United States* v. *Karo,* 468 U. S. 705, 713–715 (1984); *Steagald* v. *United States,* 451 U. S., at 211–212. "At the very core [of the Fourth Amendment] stands the right of a [person] to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman* v. *United States,* 365 U. S. 505, 511 (1961).

## B

This case involves surveillance of a home, for as we stated in *Oliver* v. *United States,* the curtilage "has been considered part of the home itself for Fourth Amendment purposes." 466 U. S., at 180. In *Dow Chemical Co.* v. *United States,*

---

scribed constitutionally protected privacy interests as those that society regards as "legitimate," using the words "reasonable" and "legitimate" interchangeably. *E. g., Oliver* v. *United States,* 466 U. S. 170 (1984); *Rakas* v. *Illinois,* 439 U. S. 128, 143–144, n. 12 (1978).

[5] "Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Ibid.* This inquiry necessarily focuses on personal interests in privacy and liberty recognized by a free society.

decided today, the Court reaffirms that the "curtilage doctrine evolved to protect much the same kind of privacy as that covering the interior of a structure." *Post*, at 235. The Court in *Dow* emphasizes, moreover, that society accepts as reasonable citizens' expectations of privacy in the area immediately surrounding their homes. *Ibid.*

In deciding whether an area is within the curtilage, courts "have defined the curtilage, as did the common law, by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private. See, *e. g., United States* v. *Van Dyke,* 643 F. 2d 992, 993–994 (CA4 1981); *United States* v. *Williams,* 581 F. 2d 451, 453 (CA5 1978); *Care* v. *United States,* 231 F. 2d 22, 25 (CA10), cert. denied, 351 U. S. 932 (1956)." *Oliver* v. *United States, supra,* at 180. The lower federal courts have agreed that the curtilage is "an area of domestic use immediately surrounding a dwelling and usually but not always fenced in with the dwelling."[6] *United States* v. *LaBerge,* 267 F. Supp. 686, 692 (Md. 1967); see *United States* v. *Van Dyke,* 643 F. 2d 992, 993, n. 1 (CA4 1984). Those courts also have held that whether an area is within the curtilage must be decided by looking at all of the facts. *Ibid.,* citing *Care* v. *United States, supra,* at 25. Relevant facts include the proximity between the area claimed to be curtilage and the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by. See *Care* v. *United States, supra,* at 25; see also *United States* v. *Van Dyke, supra,* at 993–994.

---

[6] The Oxford English Dictionary defines curtilage as "a small court, yard, garth, or piece of ground attached to a dwelling-house, and forming one enclosure with it, or so regarded by the law; the area attached to and containing a dwelling-house and its out-buildings." 2 Oxford English Dictionary 1278 (1933).

## III

### A

The Court begins its analysis of the Fourth Amendment issue posed here by deciding that respondent had an expectation of privacy in his backyard.   I agree with that conclusion because of the close proximity of the yard to the house, the nature of some of the activities respondent conducted there,[7] and because he had taken steps to shield those activities from the view of passersby.   The Court then implicitly acknowledges that society is prepared to recognize his expectation as reasonable with respect to ground-level surveillance, holding that the yard was within the curtilage, an area in which privacy interests have been afforded the "most heightened" protection.   *Ante*, at 213.   As the foregoing discussion of the curtilage doctrine demonstrates, respondent's yard unquestionably was within the curtilage.   Since Officer Shutz could not see into this private family area from the street, the Court certainly would agree that he would have conducted an unreasonable search had he climbed over the fence, or used a ladder to peer into the yard without first securing a warrant. See *United States* v. *Van Dyke, supra;* see also *United States* v. *Williams*, 581 F. 2d 451 (CA5 1978).

The Court concludes, nevertheless, that Shutz could use an airplane—a product of modern technology—to intrude visually into respondent's yard.   The Court argues that respondent had no reasonable expectation of privacy from aerial observation.   It notes that Shutz was "within public navigable airspace," *ante*, at 213, when he looked into and photo-

---

[7] The Court omits any reference to the fact that respondent's yard contained a swimming pool and a patio for sunbathing and other private activities.   At the suppression hearing, respondent sought to introduce evidence showing that he did use his yard for domestic activities.   The trial court refused to consider that evidence.   Tr. on Appeal 5–8 (Aug. 15, 1983).

graphed respondent's yard.   It then relies on the fact that the surveillance was not accompanied by a physical invasion of the curtilage, *ibid.*   Reliance on the *manner* of surveillance is directly contrary to the standard of *Katz*, which identifies a constitutionally protected privacy right by focusing on the interests of the individual and of a free society.   Since *Katz*, we have consistently held that the presence or absence of physical trespass by police is constitutionally irrelevant to the question whether society is prepared to recognize an asserted privacy interest as reasonable.   *E. g., United States* v. *United States District Court*, 407 U. S., at 313.

The Court's holding, therefore, must rest solely on the fact that members of the public fly in planes and may look down at homes as they fly over them.   *Ante*, at 213–214.   The Court does not explain why it finds this fact to be significant.   One may assume that the Court believes that citizens bear the risk that air travelers will observe activities occurring within backyards that are open to the sun and air.   This risk, the Court appears to hold, nullifies expectations of privacy in those yards even as to purposeful police surveillance from the air.   The Court finds support for this conclusion in *United States* v. *Knotts*, 460 U. S. 276 (1983).   *Ante*, at 213.

This line of reasoning is flawed.   First, the actual risk to privacy from commercial or pleasure aircraft is virtually nonexistent.   Travelers on commercial flights, as well as private planes used for business or personal reasons, normally obtain at most a fleeting, anonymous, and nondiscriminating glimpse of the landscape and buildings over which they pass.[8] The risk that a passenger on such a plane might observe

---

[8] Of course, during takeoff and landing, planes briefly fly at low enough altitudes to afford fleeting opportunities to observe some types of activity in the curtilages of residents who live within the strictly regulated takeoff and landing zones.   As all of us know from personal experience, at least in passenger aircrafts, there rarely—if ever—is an opportunity for a practical observation and photographing of unlawful activity similar to that obtained by Officer Shutz in this case.   The Court's analogy to commercial and private overflights, therefore, is wholly without merit.

private activities, and might connect those activities with particular people, is simply too trivial to protect against. It is no accident that, as a matter of common experience, many people build fences around their residential areas, but few build roofs over their backyards. Therefore, contrary to the Court's suggestion, *ante*, at 213, people do not "'knowingly expos[e]'" their residential yards "'to the public'" merely by failing to build barriers that prevent aerial surveillance.

The Court's reliance on *Knotts* reveals the second problem with its analysis. The activities under surveillance in *Knotts* took place on public streets, not in private homes. 460 U. S., at 281–282. Comings and goings on public streets are public matters, and the Constitution does not disable police from observing what every member of the public can see. The activity in this case, by contrast, took place within the private area immediately adjacent to a home. Yet the Court approves purposeful police surveillance of that activity and area similar to that approved in *Knotts* with respect to public activities and areas. The only possible basis for this holding is a judgment that the risk to privacy posed by the remote possibility that a private airplane passenger will notice outdoor activities is equivalent to the risk of official aerial surveillance.[9] But the Court fails to acknowledge the qualitative difference between police surveillance and other uses made of the airspace. Members of the public use the airspace for travel, business, or pleasure, not for the purpose of observing activities taking place within residential yards. Here, police conducted an overflight at low altitude solely for

---

[9] Some of our precedents have held that an expectation of privacy was not reasonable in part because the individual had assumed the risk that certain kinds of private information would be turned over to the police. *United States* v. *Miller*, 425 U. S. 435, 443 (1976). None of the prior decisions of this Court is a precedent for today's decision. As JUSTICE MARSHALL has observed, it is our duty to be sensitive to the risks that a citizen "should be forced to assume in a free and open society." *Smith* v. *Maryland*, 442 U. S. 735, 750 (1979) (dissenting opinion).

the purpose of discovering evidence of crime within a private enclave into which they were constitutionally forbidden to intrude at ground level without a warrant. It is not easy to believe that our society is prepared to force individuals to bear the risk of this type of warrantless police intrusion into their residential areas.[10]

### B

Since respondent had a reasonable expectation of privacy in his yard, aerial surveillance undertaken by the police for the purpose of discovering evidence of crime constituted a "search" within the meaning of the Fourth Amendment. "Warrantless searches are presumptively unreasonable, though the Court has recognized a few limited exceptions to this general rule." *United States* v. *Karo*, 468 U. S., at 717. This case presents no such exception. The indiscriminate nature of aerial surveillance, illustrated by Officer Shutz' photograph of respondent's home and enclosed yard as well as those of his neighbors, poses "far too serious a threat to privacy interests in the home to escape entirely some sort of Fourth Amendment oversight." *Id.*, at 716 (footnote omitted). Therefore, I would affirm the judgment of the California Court of Appeal ordering suppression of the marijuana plants.

### IV

Some may believe that this case, involving no physical intrusion on private property, presents "the obnoxious thing in its mildest and least repulsive form." *Boyd* v. *United*

---

[10] The Court's decision has serious implications for outdoor family activities conducted in the curtilage of a home. The feature of such activities that makes them desirable to citizens living in a free society, namely, the fact that they occur in the open air and sunlight, is relied on by the Court as a justification for permitting police to conduct warrantless surveillance at will. Aerial surveillance is nearly as intrusive on family privacy as physical trespass into the curtilage. It would appear that, after today, families can expect to be free of official surveillance only when they retreat behind the walls of their homes.

.

*States*, 116 U. S., at 635. But this Court recognized long ago that the essence of a Fourth Amendment violation is "not the breaking of [a person's] doors, and the rummaging of his drawers," but rather is "the invasion of his indefeasible right of personal security, personal liberty and private property." *Id.*, at 630. Rapidly advancing technology now permits police to conduct surveillance in the home itself, an area where privacy interests are most cherished in our society, without any physical trespass. While the rule in *Katz* was designed to prevent silent and unseen invasions of Fourth Amendment privacy rights in a variety of settings, we have consistently afforded heightened protection to a person's right to be left alone in the privacy of his house. The Court fails to enforce that right or to give any weight to the long-standing presumption that warrantless intrusions into the home are unreasonable.[11] I dissent.

---

[11] Of course, the right of privacy in the home and its curtilage includes no right to engage in unlawful conduct there. But the Fourth Amendment requires police to secure a warrant before they may intrude on that privacy to search for evidence of suspected crime. *United States* v. *Karo*, 468 U. S. 705, 713–715 (1984).