Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 7, 2003          Decided July 8, 2003

No. 01-3109

UNITED STATES OF AMERICA,
APPELLEE

v.

JEROME WENDELL MAPLE, *A/K/A* WILLIAM LEE JOHNSON,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(00cr00364–01)

———

*Beverly G. Dyer*, Assistant Federal Public Defender, argued the cause for appellant. On the briefs were *A. J. Kramer*, Federal Public Defender, and *Sandra G. Roland*, Assistant Federal Public Defender.

*Matthew T. Martens*, Assistant United States Attorney, argued the cause for appellee. On the brief were *Roscoe C.*

---

 Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Howard, Jr.*, United States Attorney, *John R. Fisher*, *Roy W. McLeese III*, *T. Anthony Quinn*, and *Mary B. McCord*, Assistant United States Attorneys.

Before: SENTELLE and ROGERS, *Circuit Judges,* and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

Opinion dissenting in part filed by *Circuit Judge* ROGERS.

SILBERMAN, *Senior Circuit Judge*: Appellant Jerome Maple contends that D.C. Metropolitan Police Department (MPD) Officer James McCourt's decision to open a closed compartment in Maple's car to relocate a cellular phone while securing the vehicle was an unreasonable search under the Fourth Amendment. He also raises a Second Amendment challenge to his conviction under D.C. law for unlicensed gun possession, an argument he did not make below. We affirm the conviction. Officer McCourt's conduct was not a search and hence did not implicate the Fourth Amendment, and Maple has not preserved his Second Amendment claim.

# I.

On September 17, 2000, at about midnight, Officer McCourt was working patrol while parked in his marked police car near the intersection of North Capitol and Buchanan Streets in the northeast section of the District of Columbia. McCourt heard screeching tires to his left and watched as a small blue-gray Datsun passed him near the intersection of North Capitol and Rock Creek Church Streets at approximately 35–40 miles per hour, a high speed for the area. McCourt activated his police lights and the car pulled over into the far northbound lane of North Capitol Street. He radioed the car's license plate number to the police dispatcher and two other officers soon arrived on the scene, MPD Officer Ellerbe and a Metro Transit Police Officer.

Appellant was the driver and sole occupant of the vehicle. He did not have a driver's license with him. Instead, he

provided McCourt with the name, date of birth, and social security number for William Lee Johnson, as well as a temporary Maryland registration card under the name Jerome Maple. The dispatcher then notified McCourt that Mr. Johnson's license had been suspended. McCourt arrested Maple for driving with a suspended license and issued traffic tickets for that violation, as well as his speeding.

Officer Ellerbe took Maple to the police station. Because Maple's car was in the right lane of a busy thoroughfare, McCourt decided to relocate the vehicle to a legal parking space on a side street, a usual practice under these circumstances. He had the option of impounding the car, but chose not to because he wanted to spare Maple the added expense. McCourt entered the car, drove a half block north, turned left onto a side street and parked the car in a legal spot against the curb. As he leaned over the passenger's seat to lock the passenger door, he saw a cellular phone on the floor. Concerned that someone would see it and break into the car, McCourt tried to place the phone in the glove compartment, but it was either inaccessible or nonexistent, he could not remember which. Looking for an alternative, he noticed that there was also a compartment in the console between the bucket seats. He lifted the top to put the phone inside. As he raised the lid, he saw a silver pistol in the compartment. McCourt immediately called the dispatcher to request that an evidence technician come to recover the gun. He then drove Maple's car back to North Capitol Street, where he had left his own police cruiser.

When the evidence technician, Officer Lazarus, arrived, McCourt showed him the pistol in the console. As Lazarus focused on the compartment where McCourt was pointing, the technician noticed a small piece of cellophane, wrapped up and tied in a knot, sitting on the console between the compartment where the pistol was found and the gearshift lever. McCourt, surprised that he had not noticed the package himself, picked it up and saw that it contained what appeared to be crack cocaine. The car was then fully searched but no additional contraband or weapons were found.

At the suppression hearing, Maple argued, *inter alia*, that McCourt violated the Fourth Amendment by opening the closed compartment without a warrant and in violation of the department's procedures. He also argued that the search could not be justified as an exercise of the police department's "community caretaking function," since the existence of a cell phone in plain view did not pose a serious threat to public safety. Judge Friedman, finding McCourt a "very, very credible witness," denied the motion to suppress, holding that, pursuant to the traffic maintenance powers of the police, the officer had a right to move the car off of North Capitol Street and to secure it by locking it up. He thought that McCourt's attempt at securing the cell phone in the compartment was a reasonable exercise in service of the community and not a violation of the Fourth Amendment.

At trial before Judge Johnson (Judge Friedman fell ill), Officer Lazarus testified that he recovered from the car a .380 caliber Davis Industries semiautomatic pistol with four rounds in the magazine, as well as a plastic bag containing 6.5 grams of cocaine base. The government also introduced evidence that Maple had been arrested previously for crack cocaine possession. The jury returned verdicts of not guilty on the charges of possession with intent to distribute five grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(iii), and possession of a firearm during a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1). Maple was found guilty, however, on the remaining charges of possession of cocaine base in excess of five grams, in violation of 21 U.S.C. § 844(a), and carrying a pistol without a license, in violation of D.C. CODE ANN. § 22–3204(a) (1981) (now codified at D.C. CODE ANN. § 22–4504(a) (2001)).

## II.

This case has undergone something of a metamorphosis. The district judge thought Officer McCourt's opening of the console in order to deposit the cell phone was justified under what the Supreme Court has termed the "community caretak-

5

ing function" of the police. And the government's brief strongly supports that position.

It is common ground between the parties that if the police wish to search a car without a warrant to inventory its contents they must act in accordance with established procedures. *See Florida v. Wells*, 495 U.S. 1, 4 (1990); *Colorado v. Bertine*, 479 U.S. 367, 374 n.6 (1987). But the government contends that this situation is not governed by the requirements of an inventory search, because the officer's objective in moving the car and opening the console was to protect defendant's property. Its brief relies on *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973), in which the Supreme Court first used the community caretaking function rationale. There, local Wisconsin police officers arrived at the scene of a severe car accident involving an intoxicated Chicago police officer, Chester J. Dombrowski. He was arrested for drunk driving and taken to the station. Aware that all Chicago officers were required by regulation to carry service revolvers at all times and unable to get the location of the gun from the incoherent driver, the Wisconsin police performed an initial search of the front seat and glove compartment. They also returned to search the car again later that night after it had been towed to a local garage and left unguarded. Although the Wisconsin officer did not find the gun, he did uncover items soaked with blood on the floor of the car and in the trunk. When Dombrowski was confronted with the materials back at the station, he was prompted to confess that "there was a body lying near the family picnic area at the north end of his brother's farm." *Cady*, 413 U.S. at 437 (internal quotations omitted). After the body of one Herbert McKinney was discovered, warrants were issued leading to the discovery of additional evidence connecting Dombrowski to the crime, and he was eventually convicted of first-degree murder. The Court upheld the warrantless searches of Dombrowski's vehicle at the scene and at the private garage, since the officers had reacted reasonably to the accident out of "concern for the safety of the general public who might be endangered if an intruder removed a revolver from the trunk of the vehicle." *Id.* at 447; *see also Smith v. Thornburg*, 136

F.3d 1070, 1075 (6th Cir. 1998) (concluding that officers were entitled to make a warrantless entry into an unoccupied vehicle left with its motor running in an area known as a dumping ground for stolen vehicles "in order to protect themselves and the public from the danger created by the manner in which plaintiff's car was left unattended").

Still, as the government acknowledged at oral argument, in *Cady* the Court noted that the state court had found as a fact that "the search of the trunk to retrieve the revolver was standard procedure in (that police) department, to protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands." *Cady*, 413 U.S. at 443 (internal quotations omitted). And in our case it does not appear that the Metropolitan Police Department's regulations, which extensively deal with inventory searches and impounds, address this situation. *See generally* MPD Gen. Order 602(I) (May 26, 1972).[1]

The government also suggested at oral argument, however, that "there is a third category of cases that's identified in *Cady* by citation to [sic] *United States v. Harris*, which is not

---

[1] The dissent suggests that the specific rule violated provides that the automobile "shall not be inventoried in any way" unless taken to a police facility. *Id.* at 602(I)(B)(3)(b). Dissent Op. at 5. But Officer McCourt clearly was not conducting an inventory, defined by the General Order as "an administrative process by which items of property are listed and secured." *Id.* at 602(I)(B). Nor in fact did McCourt "search" the vehicle according to the procedures, since the Order describes a search as "an examination of a person, place or thing *with a view toward discovery* of weapons, contraband, instrumentalities of a crime, or evidence." *Id.* at 602(I)(A) (emphasis added). Furthermore, contrary to the dissent's suggestion, Dissent Op. at 6, given the detailed distinctions in the Order between impound and non-impound contexts, *see id.* at 602(I)(B)(3–4), there is no reason to assume that the procedures for handling personal property in impounded vehicles, (those "taken into police custody and placed on police department property or . . . near a police facility"), *id.* at 602(I)(B)(4), would also apply to cars that have not been taken to a designated police facility.

cited in our brief, but ... seems to be more analogous, frankly, to this situation." (Oral Argument Tr. at 18, April 7, 2003). Counsel went on to point out that in *Harris*, the Court noted that although there was an intrusion, "it was not a search in the sense of hunting for something." *Id.*

Actually, *Harris v. United States*, 390 U.S. 234 (1968), a short, *per curiam* opinion of the Supreme Court, held that when an officer, after having conducted an inventory search of an impounded vehicle (pursuant to regulations of the MPD), opened a door in order to roll up the window for security purposes, (the district court had determined that the officer went to raise the window to protect the car's interior from rain), *see Harris v. United States*, 370 F.2d 477, 478–79 (D.C. Cir. 1966), and found what turned out to be a robbery victim's automobile registration card, he was not conducting a search *at all*. "[T]he discovery of the card was not the result of a search of the car, but of a measure taken to protect the car while it was in police custody. Nothing in the Fourth Amendment requires the police to obtain a warrant in these *narrow* circumstances." *Harris*, 390 U.S. at 236 (emphasis added). In other words, *Harris* appears to recognize that not every intrusion, not every opening up of a door, window, or a console is a search even implicating the Fourth Amendment. The government at oral argument seemed to be shifting somewhat, without defendant's objection, to that rationale to affirm the district court.

A more recent Supreme Court case, *Kyllo v. United States*, 533 U.S. 27 (2001), supports this reading of *Harris*. Although the Court's holding is not particularly relevant–that where the government uses a thermal imaging device to determine whether marijuana is grown in a house it is conducting a search governed by the Fourth Amendment, even though there is no physical intrusion–the opinion, in passing, gives its definition of a search. The Court observes that "[w]hen the Fourth Amendment was adopted, as now, to 'search' meant '[t]o look over or through *for the purpose* of finding something; to explore; to examine by inspection; as, to *search* the house for a book; to *search* the wood for a thief.'" *Kyllo*, 533 U.S. at 33 n.1 (2001) (quoting N. Webster,

An American Dictionary of the English Language 66 (1828) (reprint 6th ed. 1989)) (first emphasis added).

The opinion goes on to explain that Supreme Court jurisprudence–which focuses on a person's subjective expectation of privacy in determining whether a search takes place–is really asking whether a search governed by the Fourth Amendment occurred. *See id.* at 32–33. In other words, the anterior question before any court is whether a search *of any kind* has occurred, and only after that question is answered in the affirmative are we to consider the target's expectation of privacy.

It is undisputed in this case that when McCourt opened the console he was not looking for "something." It follows then that he did not conduct a search and therefore the Fourth Amendment was not implicated. His opening of the console should be regarded no differently than his opening of the car door in order to drive the car to a safer place. Appellant does not even claim that the door opening was a search–nor could he in light of *Harris.* The same analysis would apply, let us say, if an officer legitimately in a house to interview a witness attempts to leave the house and inadvertently walks into a closet next to an exit door and sees guns and drugs. These situations are somewhat analogous to the plain view exceptions, *see, e.g., Arizona v. Hicks*, 480 U.S. 321, 328 (1987) ("a truly cursory inspection–one that involves merely looking at what is already exposed to view, without disturbing it–is not a 'search' for Fourth Amendment purposes"), although the latter are typically extensions of a legitimate search whereas in our case there was no search at all.

To be sure, *if* a search had occurred, the reasonableness of the officer's actions would be judged by an objective standard, not his subjective intentions. *See United States v. Magnum*, 100 F. 3d 164, 170 (D.C. Cir. 1996) (citing *Whren v. United States*, 517 U.S. 806 (1996)). And certainly an exploratory search, which does not focus on any particular object, is no less a search than one which seeks a specified item. *See Bond v. United States*, 529 U.S. 334 (2000). But we think our dissenting colleague is incorrect in arguing that any police

intrusion into a closed compartment or closed door, regardless of the circumstances, is *per se* a search if a defendant had privacy expectations in the content of the compartment or room. No case that we have found has so held.

Appellant argues that to sanction Officer McCourt's actions–even if they were entirely innocent–is to open the door to police misbehavior. We are warned that if an officer were to find in a car any object of value, he would have an excuse to open a locked glove compartment or even a trunk. But that argument discounts the ability of district judges to detect subterfuge. The greater the effort an officer devotes to opening a car's closed compartment the more likely his purpose is, at least in part, to search. Still we agree with appellant's suggestion that the much better practice, (which the police department could adopt), would be to require an officer to take the valuable object to the station with the car keys.

In sum, we think it is unnecessary to decide whether the community caretaking exception extends to the facts of this case because no search took place. Officer McCourt's discovery of the gun was a purely inadvertent byproduct of his opening of the console to place the cell phone inside.[2]

## III.

Maple contends that the gun licensing statute he was convicted under, D.C. Code § 22–4504(a), effectively operates as a near total prohibition on possession of any type of firearm by anyone in the District of Columbia, thereby infringing upon his right to "bear arms" under the Second Amendment.

The statute reads in relevant part:

---

[2] It is not clear to us that all warrantless searches conducted pursuant to the community caretaking exception must be in accordance with formal procedures. *See United States v. Markland*, 635 F.2d 174, 176 (2nd Cir. 1980) (holding that an officer's opening of a "surprisingly heavy" beverage container at the scene of an auto accident was justified because it "could have contained anything from beer to bullion or a bomb").

> No person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law, or any deadly or dangerous weapon capable of being so concealed.

D.C. CODE ANN. § 22–4504(a). And the Second Amendment provides that:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. CONST. amend. II. Because Maple did not raise this contention in the district court, we cannot address the claim unless there is an (1) "error," (2) that is "plain," (3) that "affects substantial rights," and (4) "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States,* 520 U.S. 461, 467 (1997) (internal citations omitted).

Maple suggests that it would be "plain error" to refuse to consider the constitutionality of the D.C. law after *United States v. Emerson,* 270 F.3d 203, 260–61 (5th Cir. 2001) (upholding the constitutionality of 18 U.S.C. § 922(g)(8), which prohibits persons who are subject to domestic restraining orders from possessing firearms, but recognizing that the Second Amendment guarantees a personal right to possess them), *cert. denied,* 536 U.S. 907 (2002),[3] and the corresponding Justice Department's brief for the United States in opposition to the petition for a Writ of Certiorari (as well as

---

[3] The court stated:

> Although, as we have held, the Second Amendment *does* protect individual rights, that does not mean that those rights may never be made subject to any limited, narrowly tailored specific exceptions or restrictions for particular cases that are reasonable and not inconsistent with the right of Americans generally to individually keep and bear their private arms as historically understood in this country.

*Id.* at 261 (emphasis in the original).

its related internal memoranda sent to United States' Attorneys).

Although there are cases in which it is appropriate to hear a constitutional claim not raised at trial, *see, e.g., Johnson*, 520 U.S. at 467–70, clearly this is not one of them. Convictions for unlicensed gun possession have been upheld for several years in the District of Columbia. *See, e.g., United States v. Toms,* 136 F.3d 176 (D.C. Cir. 1998); *Staten v. United States*, 562 A.2d 90 (D.C. 1989); *see also United States v. Drew,* 200 F.3d 871, 876 (D.C. Cir. 2000) (declining to reach appellant's Second and Fifth Amendment challenges to his conviction under 18 U.S.C. § 922(g)(8) for the possession of a firearm while subject to a court order, because he did not raise the issue below).

Accordingly, the judgment of the district court is

*Affirmed.*

1

ROGERS, *Circuit Judge*, *dissenting in part*: The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ." U.S. Const. amend. IV. These protected "effects" include automobiles, *Preston v. United States*, 376 U.S. 364, 366–67 (1964), and although a person "has a lesser expectation of privacy in a motor vehicle because . . . [i]t travels public thoroughfares where both its occupants and its contents are in plain view," *New York v. Class*, 475 U.S. 106, 113–14 (1986) (quoting *Cardwell v. Lewis*, 417 U.S. 583, 590 (1974) (plurality opinion)), "a car's interior . . . is nonetheless subject to Fourth Amendment protection from unreasonable intrusions by the police," *Class*, 475 U.S. at 114–15. The government's "intrusion into a particular area, whether in an automobile or elsewhere," violates the Fourth Amendment if "the area is one in which there is a 'constitutionally protected reasonable expectation of privacy.'" *Id.* at 112 (citing *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)). Because the government failed to offer evidence that Maple, upon his arrest for traffic violations, had waived a reasonable expectation of privacy in a closed compartment of his car, which had not been impounded by the police, the warrantless search of that compartment was impermissible under the Fourth Amendment.

The court's holding hinges on its misconception of what constitutes a search under the Fourth Amendment. It is long settled that " '[a] search occurs when an expectation of privacy that society is prepared to consider reasonable is infringed.'" *Soldal v. Cook County*, 506 U.S. 56, 63 (1992) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984) (internal quotations omitted)). Or stated conversely, "a Fourth Amendment search does *not* occur . . . unless 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that expectation as reasonable.'" *Kyllo v. United States*, 533 U.S. 27, 33 (2001) (quoting *California v. Ciraolo*, 476 U.S. 207, 211 (1986)). A closed, opaque compartment by its nature secures its contents from public view — as the officer indicated was his intention with respect to Maple's cell phone — and

when Maple was arrested, the console in his car was closed. The government, which has the burden of proving the lawfulness of the search, *Mincey v. Arizona*, 437 U.S. 385, 390–91 (1978), offered no evidence that Maple did not have a privacy interest in the contents of the console or had waived that interest, and the district court made no finding that the closed console was not a repository of Maple's personal effects or that Maple had no expectation of privacy, much less that the officer had probable cause to open it. *See Class*, 475 U.S. at 118; *Cardwell*, 417 U.S. at 591; *cf. California v. Acevedo*, 500 U.S. 565, 579 (1991)*; United States v. Ross*, 456 U.S. 798, 800, 825 (1982).

To salvage the seizure of Maple's property, the court adopts the novel notion that a police officer who opens a closed compartment in a defendant's car is not engaged in a search under the Fourth Amendment. Op. at 2, 8. This is so, the court explains, because the officer's subjective intent was to save Maple the expense of impounding his car and to protect his car by securing from public view a cell phone that he had left on the floor of his car. Op. at 3, 8. "In determining whether a . . . search is reasonable under the Fourth Amendment," however, "courts look to objective evidence, not subjective intentions." *United States v. Magnum*, 100 F.3d 164, 170 (D.C. Cir. 1996) (citing *Whren v. United States*, 517 U.S. 806 (1996)). In other words, "the issue is not" the law enforcement officer's "state of mind" — whether he was intentionally rummaging about for contraband or wished to find something in particular — "but the objective effect of his actions" — whether a reasonable expectation of privacy was infringed. *Bond v. United States*, 529 U.S. 334, 338 n.2 (2000). For instance, in holding that the search of the inside of a car (to remove papers on the dashboard obscuring the vehicle identification number that would otherwise be in plain view) was "sufficiently unintrusive to be constitutionally permissible," the Supreme Court in *Class* found significant that the officer "did not reach into any compartments or open any containers." *Class*, 475 U.S. 118–19. That finding contrasts sharply with the officer's opening of the closed console

in Maple's car, which upset Maple's reasonable expectation of privacy, regardless of the officer's purpose.

Although the court labors to support its approach by pointing to a definition of "search" in *Kyllo*, 533 U.S. at 33 n.1, the court misreads that opinion. In the court's view, "the anterior question before any court is whether a search *of any kind* has occurred, and only after that question is answered in the affirmative are we to consider the target's expectation of privacy." Op. at 8. But these two inquiries cannot be decoupled because the target's expectation of privacy itself defines whether a search occurred at all. In *Kyllo* the Supreme Court reaffirmed the longstanding proposition that "a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." 533 U.S. at 33 (citing *Katz*, 389 U.S. at 361 (Harlan, J., concurring)). Then, after explaining that the scope of a search is defined by privacy expectations, the Court held that information obtained through thermal imaging of a private home "was the product of a search," rejecting the view that information was not obtained regarding the interior of the home. *Kyllo*, 553 U.S. at 35; *see also id.* at n.2. The holding of *Kyllo* is thus more relevant than the court suggests, Op. at 7–8, for it reenforces the importance of privacy expectations in Fourth Amendment analysis. Moreover, *Kyllo*'s holding makes clear that the dictum relied on by the court cannot be construed as exempting "inadvertent" discoveries in the course of caretaking, Op. at 9, from the Fourth Amendment's protections. Whether deliberate or inadvertent, a governmental intrusion is a search where it interferes with an individual's reasonable privacy expectations. *Cf. Horton v. California*, 496 U.S. 128, 141 (1990).

The court errs in following the government's reliance on *Harris v. United States*, 390 U.S. 234 (1968) (per curiam), for the principle that police officers may seize property found in automobiles when they are "not conducting a search *at all*." Op. at 7. *Harris* cannot support the conclusion that no search occurred of Maple's car. In *Harris,* the defendant's car was impounded, and the officer discovered the robbery victim's car registration while taking measures "to protect the

4

[defendant's] car while it was in police custody," as required by a regulation of the D.C. Metropolitan Police Department ("MPD"). Upon opening the passenger door in order to close the windows and thereby secure the car against the elements, in compliance with the MPD regulation, the officer saw the victim's car registration on the metal stripping. *Harris*, 390 U.S. at 235–36. Maple's car, by contrast, had not been impounded, and the officer was not acting pursuant to standardized departmental procedures in opening the console. Moreover, the registration card in *Harris* "was plainly visible," and "[i]t has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." *Id.* at 236 (citations omitted). But Maple's gun, unlike his cell phone, was not in plain view; it was located in a closed compartment and was discovered only after the officer opened the compartment without Maple's authorization. Thus, the "narrow circumstances" of *Harris*, *id.*, where there may not be a search because the officer is acting pursuant to police procedures for securing impounded cars and inadvertently discovers an object in plain view, do not cover the opening of the console in Maple's car.

Under the Supreme Court's precedents, then, the officer's opening of the closed compartment in Maple's car constituted a search, and a warrantless search of private property is per se unreasonable unless it falls within one of the " 'few specifically established and well-delineated exceptions' " to the warrant requirement. *Mincey*, 437 U.S. at 390 (quoting *Katz*, 389 U.S. at 357). In determining whether the officer's search of the closed console was lawful under the Fourth Amendment, the Supreme Court's decision in *Cady v. Dombrowski*, 413 U.S. 433 (1973), is instructive. In *Cady*, the Supreme Court held that a warrantless search of the trunk of a car was not unreasonable under the Fourth and Fourteenth Amendments because the police had reason to believe that the trunk contained a gun, the car was vulnerable to intrusion by vandals, and public safety could have been endangered had an intruder removed a gun from the trunk of the vehicle. *Id.* at 447–48. The court observed that "local police officers . . .

frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what . . . may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id*. at 441. The Supreme Court in *Cady* emphasized, however, that the police had (1) exercised a form of control over the car, and (2) acted under "standard procedure in (that police) department." *Id*. at 442–43. In other words, because the police had taken temporary custody of the car, the search was not merely the subjective choice of the officer conducting the search. *See also Harris*, 390 U.S. at 235.

Here, the police officer exercised a form of control over Maple's car, but the district court made no finding that the officer acted pursuant to established procedures of the MPD when he opened the console to secure the cell phone and, thereby, the car. The officer testified that he routinely relocates cars to legal parking spaces following traffic arrests, but he did not claim that MPD officers routinely open closed compartments in private automobiles to secure a defendant's personal property. Nor did the government, which has the burden, *Mincey*, 437 U.S. at 390–91, introduce any such evidence.

Under the MPD's policy and procedures governing *Automobile Searches and Inventories*, the officer was not authorized to open the console in order to secure the cell phone. *See generally* MPD Gen. Order 602(I) (May 26, 1972), *reprinted in* Joint Appendix at 37–52. The applicable procedures provide that if a prisoner's car is not taken to a location at or near a police facility, "it shall not be inventoried in any way," *id*. at 602(I)(B)(3)(b), an "inventory" being defined as "an administrative process by which items of property are listed and *secured*," *id*. at 602(I)(B) (emphasis added). Further, such car shall not be searched unless: (1) the arresting officer does so in the presence of the defendant at the time of his arrest, in which case the officer may search "only those areas within the immediate control of the defendant (the area from which the arrested person might gain possession of weapons or destructible evidence)," *id*. at 602(I)(A)(1)(a)(1);

or (2) a police officer has probable cause to believe that the car contains the fruits, instrumentalities, contraband, or evidence of the crime for which the defendant was arrested–exceptions not relevant in this case. *Id.* at 602(I)(A)(1)(a)(1) & (b)(1). Even if Maple's car had been taken to a location at or near a police facility, MPD policy only authorizes the officer to remove "personal property which can easily be seen from outside the vehicle and which reasonably has a value in excess of $25," to take the property to the police facility, and to enter it on a property log for later return to the defendant. *Id*. at 602(I)(B)(3)(b). Instead, in searching for a place to secure Maple's cell phone, the officer decided to open a closed compartment in Maple's car.

Absent personal property found inside a car that might pose a danger to the police officer or to the public, thus affording probable cause for the officer to secure the weapon and prevent it from falling into the wrong hands, *see Cady*, 413 U.S. at 442, *Cady* required the officer to act in accordance with the MPD's established procedures for protecting personal property in a car that is in temporary police custody. Doing so ensures that any police intrusion into private property is limited in scope to the extent necessary to carry out the caretaking function, *South Dakota v. Opperman*, 428 U.S. 364, 375 (1976), thereby preventing warrantless searches, such as inventories, *id.* at 367–76, from becoming "a ruse for general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990). To the extent that MPD procedures did not authorize the officer to open closed compartments inside an unimpounded car in order to secure the defendant's personal property, the officer had no other authorized reason to open the console. Neither of the exceptions under MPD's established procedures apply: the search did not occur in Maple's presence at the time of his arrest, MPD Gen. Order 602(I)(A)(1)(a)(1), and the officer did not testify, nor did the district court find, that the search was conducted with probable cause associated with the crime for which Maple was arrested, *id*. at 602(I)(A)(1)(b)(1). Although the court resists applying MPD General Order 602 according to its plain terms, *see, e.g.,* Op. at 6 & n.1, the established MPD procedures provide for securing personal property in

plain view: the officer should take the car to a location at or near a police facility if the car is not impounded. Nothing since *Cady* suggests that the Supreme Court has abandoned its emphasis on the need for the police to act pursuant to "standardized criteria" or "established routine" when opening containers. *See Wells*, 495 U.S. at 4–5; *cf. Colorado v. Bertine,* 479 U.S. 367, 375–76 (1987); *Illinois v. Lafayette,* 462 U.S. 640, 648 (1983); *Opperman,* 428 U.S. at 375–76.

Because the officer's opening of the console does not fall within one of the "few specifically established and well-delineated exceptions" to the warrant requirement, *Mincey*, 437 U.S. at 390, the reasonableness of the officer's conduct is to be determined by reference to whether he followed the MPD's procedures. *See Wells*, 495 U.S. at 3–4; *Opperman*, 428 U.S. at 376; *United States v. Duguay*, 93 F.3d 346, 351–52 (7th Cir. 1996); *United States v. Marshall*, 986 F.2d 1171, 1174–76 (8th Cir. 1993); *United States v. Johnson*, 936 F.2d 1082, 1084 (9th Cir. 1991). MPD General Order 602 established, and thus restricted, the manner in which a police officer can protect a defendant's property, and nothing in *Harris*, on which the court relies, Op. at 7, is to the contrary, for there the officer was acting pursuant to established police department procedures. *Harris*, 390 U.S. at 235. Nor does the record here show inadvertent conduct under the plain view doctrine, Op. at 8; the officer spotted the gun only after he opened the closed console.

Rather than recognize the limited exceptions to the per se rule for warrantless searches, *see Mincey*, 437 U.S. at 390; *Cady*, 413 U.S. at 439, the court acknowledges the Supreme Court's jurisprudence, Op. at 5, and proceeds to ignore Maple's privacy interest in his car console. *See Kyllo*, 533 U.S. at 33; *cf. Class*, 475 U.S. at 118. Even assuming the privacy interest in an unlocked, closed compartment is of a lesser order than the privacy interest in a locked glove compartment or, as in *Wells*, 495 U.S. at 2, in a locked trunk, the salient

point is that whatever his good intentions, the officer failed to follow established police policy and procedures for securing a defendant's property. With the court's new exception to the per se rule, accomplished by redefining when a search occurs under the Fourth Amendment, police officers who profess not to be engaged in criminal investigation are free to devise their own procedures for protecting personal property inside a defendant's car — free even to open closed compartments — notwithstanding the MPD's established policy limiting warrantless searches to particular circumstances.

Accordingly, because the police officer conducted a warrantless search of Maple's car console without Maple's consent or probable cause, and in opening the console was not following established police procedures for securing a defendant's property, the district court erred in denying the motion to suppress the evidence seized by the police from the console as a violation of Maple's Fourth Amendment rights. Because I concur in the holding that Maple did not preserve his Second Amendment claim, and because the drugs were in plain view on top of the console, *Harris*, 390 U.S. at 236, I would reverse the judgment and remand the case for the retrial that Maple seeks, Appellant's Br. at 22, on the drug charge.