Edna FRAZIER, Plaintiff,

v.

SOUTHEASTERN PENNSYLVANIA
TRANSPORTATION AUTHORITY,
Defendant.

No. 94–CV–4957.

United States District Court,
E.D. Pennsylvania.

Nov. 27, 1995.

Bruce L. Neff, Neff & Associates, Philadelphia, PA, for plaintiff.

John M. Phelan, Richard C. Biedrzycki, Phillips and Phelan, Philadelphia, PA, for defendant.

## MEMORANDUM AND ORDER

JOYNER, District Judge.

This § 1983 case is before the Court today on motion of the defendant, the Southeastern Pennsylvania Transportation Authority ("SEPTA"), which asks for an award of summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons that follow, SEPTA's motion will be granted and the case will be dismissed.

### I

The plaintiff in this case is Edna Frazier, who was a passenger on a SEPTA bus that was allegedly involved in a traffic accident in 1985. Ms. Frazier later filed a personal injury lawsuit against SEPTA in the Philadelphia County Court of Common Pleas seeking damages for injuries allegedly sustained as a result of the incident. In defense of the case, SEPTA retained the services of J.R. Gettier & Associates ("Gettier"), an investigative service, to monitor Ms. Frazier's activities. Fruits of the surveillance were introduced at trial to rebut Ms. Frazier's claim that she had incurred permanent, disabling injuries. Ms. Frazier's case went to the jury, which returned a verdict in SEPTA's favor on October 5, 1993.[1]

On April 22, 1994, Ms. Frazier filed a second action in the Court of Common Pleas, in which she alleged that SEPTA was liable to her under a variety of common law theories. Ms. Frazier amended her complaint on July 25 to add a civil rights claim under 42 U.S.C. § 1983. The nub of Ms. Frazier's § 1983 claim is that the nature of the surveillance undertaken by SEPTA in defense of the underlying action was so intrusive and unsettling that it violated her federally-protected civil rights. She further alleges that SEPTA (1) "set up" medical examinations for the purpose of videotaping her coming to and departing from the sessions, and (2) conducted the surveillance, with knowledge of her precarious mental state,[2] for the purpose of

---

1. Ms. Frazier's appeal to the Commonwealth Court was unanimously rejected by a three-judge panel on April 13, 1995. Her petition before the Supreme Court of Pennsylvania is pending.

2. Ms. Frazier appears to suffer from paranoia. For example, her testimony reflects her belief that SEPTA has implanted electronic bugging devices in her mouth, rectum, vagina, foot, nose and ears. Plaintiff's 3/14/95 depo. at 20.

rendering her incompetent to testify at the trial. In so doing, Ms. Frazier asserts that SEPTA violated a number of rights guaranteed to her by the Constitution. SEPTA responded to the amended complaint by removing the case to this Court and submitting a motion to dismiss on August 15. In a Memorandum and Order dated December 1, 1994, this Court dismissed all of the common law claims, leaving SEPTA to defend only the civil rights claim. *Frazier v. Southeastern Pennsylvania Transp. Auth.*, 868 F.Supp. 757 (E.D.Pa.1994). Later, on February 17, 1995, we issued an order limiting the scope of discovery to the issue of whether SEPTA can be liable under § 1983. Thus, in this Memorandum, we will determine if Ms. Frazier can identify a genuine issue of material fact regarding whether the nature of the surveillance was such as to violate her civil rights.

## II

### A. *The Summary Judgment Standard*

■■■ This Court is authorized to award summary judgment "if the pleadings, depositions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, the Court's responsibility is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986). The non-moving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir.1989) (citing *Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. at 2510). Further, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986)). Boiled to its essence, the summary judgment standard requires the non-moving party to create a "sufficient disagreement to require submission [of the

evidence] to a jury." *Liberty Lobby*, 477 U.S. at 251–52, 106 S.Ct. at 2511–12.

### B. *Evidence Generated during Discovery*

As we noted above, the gravamen of the complaint is that the surveillance performed by SEPTA in defense of the underlying tort suit violated Ms. Frazier's federally-protected civil rights. The evidence presented shows that Norman Hegge, an in-house SEPTA attorney, ordered that Ms. Frazier's physical activity be monitored after she alleged in a deposition that she had incurred a permanent disability. Gettier was retained to conduct the surveillance on January 8, 1992, and commenced the monitoring of Ms. Frazier on January 10. The overall surveillance effort can be broken down into three phases: the first phase beginning on January 10 and concluding on April 7; the second phase lasting from September 28 through November 11; and the final phase running from July 21 through July 29, 1993.

#### 1. *Phase 1*

After receiving information regarding Ms. Frazier's last known address from SEPTA, Gettier commenced its surveillance effort by monitoring a residence on Chestnut Street in West Philadelphia. The Chestnut Street residence was monitored on January 10, January 14–16, January 24, February 5, and February 21. On January 16, the Gettier investigator peered into the front porch and spotted a Bible on the porch table. These monitoring efforts proved fruitless, however, because Ms. Frazier, unbeknownst to Gettier and SEPTA, had been evicted from the Chestnut Street residence in November of 1991. On March 13, Ms. Frazier attended a court-ordered vocational evaluation performed by Dr. Philip Spergel. Following her appointment, Gettier investigators followed Ms. Frazier to a residence on Corinthian Street in Philadelphia's Fairmount neighborhood.

Gettier investigators returned to the Corinthian Street residence on the mornings of March 17, 18, and 19. The only observation of Ms. Frazier the investigators made during these days occurred on March 17, when investigators briefly observed her departing

and reentering the building. On March 20, Gettier investigators observed Ms. Frazier leave the Corinthian Street residence at 9:20 A.M., accompanied by an elderly woman. The investigators then followed Ms. Frazier and the elderly woman to Market Street in Center City Philadelphia, where the two women spent approximately three hours shopping and running various errands. Ms. Frazier was observed carrying large shopping bags and walking up and down stairs. Gettier investigators captured this activity on videotape and in still photographs. The surveillance was performed exclusively in public areas.

On March 26, Gettier investigators monitored both the Chestnut Street and the Corinthian Street addresses. One investigator placed a paper wedge in the front door of the Chestnut Street residence, in an attempt to ascertain whether anyone was going in or out of the dwelling. Gettier investigators continued to monitor the Corinthian Street residence through April 6, but made no further observations of Ms. Frazier. Gettier learned that Ms. Frazier had been living at the Corinthian Street residence in her capacity as an employee of Jewish Employment Vocational Services, and that she was charged with caring for a woman named Maria Stringfield. Further, Gettier determined that Ms. Frazier and Ms. Stringfield had moved out of the Corinthian Street residence on March 26. On April 7, a Gettier investigator, accompanied by the property manager of the Corinthian Street apartment, entered the residence and found that it was completely empty.

### 2. *Phase 2*

SEPTA attorneys presented the plaintiff with the videotape memorializing Ms. Frazier's March 20 foray into Center City Philadelphia, and asked her reconsider her settlement demand of $200,000. When she declined, SEPTA decided to order additional surveillance, hoping to acquire stronger evidence in rebuttal of Ms. Frazier's claims. The second phase of the surveillance commenced on September 28, when Gettier investigators positioned themselves outside of Ms. Frazier's new residence on Pine Street in West Philadelphia. The surveillance continued through October 1, but the investigators failed to observe Ms. Frazier during that time. Surveillance was again established daily from October 4 through October 7, with negative results. On November 11, Ms. Frazier was evaluated by Dr. Timothy Michals, a forensic psychiatrist. At the conclusion of the evaluation, Gettier investigators followed Ms. Frazier to a small grocery, and observed her carrying a bag out of the store. Investigators then followed Ms. Frazier back to the Pine Street residence.

### 3. *Phase 3*

After learning that Ms. Frazier had been seen marching, wearing a placard and passing out pamphlets at a public square adjacent to City Hall (15th and Market Streets) in Center City Philadelphia, SEPTA ordered a final round of surveillance. On July 21, 1993, Gettier investigators established surveillance at 15th and Market Streets, but failed to locate Ms. Frazier. The investigators returned to 15th and Market on July 22, 23, 24, 27 and 28, with negative results. Moreover, investigators learned during this period that Ms. Frazier had moved out of the Pine Street residence and had relocated to a residence in Darby, Pennsylvania. On July 26, a Gettier investigator went to the Darby residence, and observed and videotaped Ms. Frazier briefly going in and out of the home. Investigators established surveillance outside the Darby residence on July 27, 28 and 29, with negative results.

In summary, while the surveillance operations continued on and off for approximately 18 months, the majority of Gettier's efforts were expended in an attempt to locate Ms. Frazier. Indeed, Gettier investigators observed Ms. Frazier on only five days: March 13, March 17, March 20, November 11, and July 26. On each occasion, Ms. Frazier was observed out of doors and in a public place. Further, on each of the three occasions when there was some form of a physical intrusion—the cursory inspection of the porch area at Chestnut Street, the placement of the paper wedge in the door at Chestnut Street, and the entry into the empty apartment on Corinthian Street—Ms. Frazier had previously vacated the premises in question. Fi-

nally, the undisputed evidence suggests that the surveillance was conducted in a discrete and unobtrusive manner. Ms. Frazier could not testify as to any instance in which she was specifically aware of the presence of the investigators.[3]

#### 4. *Other Evidence*

In attempting to defeat SEPTA's summary judgment motion, Ms. Frazier points to other evidence which she argues supports her theory of liability. First, Ms. Frazier has produced evidence to suggest that Gettier investigators recommended that an appointment be staged so that they could locate Ms. Frazier. For example, in the January 28, 1992 surveillance report, an investigator suggests that "the subject either visit Septa Offices or a Physicians [sic] Office for identification of subject by [the investigator] and commencement of surveillance." Similar comments appear in the January 17 and February 7 reports.[4] Second, Ms. Frazier would be able to show that SEPTA and Gettier were aware of her mental frailties during the time the surveillance operations were underway. For instance, in a report dated February 21, 1992, a Gettier investigator remarked that "the subject is supposedly paranoid." On October 1, 1992, Ms. Frazier's attorney provided SEPTA with a report prepared by Dr. Richard Saul, a psychiatrist who diagnosed Ms. Frazier as suffering from paranoia. Two months later, SEPTA retained Dr. Michals, who examined Ms. Frazier and concluded that she suffered from a delusional disorder.

Further, Ms. Frazier has produced evidence suggesting that while SEPTA's potential liability was limited by statute to $250,000 in the underlying tort suit, it expended $43,000 for the investigatory services. Ms. Frazier also proffers a report prepared by Seymour Page, an expert in claims management, who reviewed Gettier's work and concluded that "the amount and cost of continuing surveillance was, in [his] opinion, extraordinary and highly unusual." Mr. Page further opined that the $43,000 expended was extreme given SEPTA's potential liability: "I do not recall, during my [35 year] career, reviewing a claims file with $43,000+ of surveillance effort on one subject, with the possible exception one or two occasions (cases) wherein there was several million dollars of exposure to the insurance carrier involved."

### C. *Legal Discussion*

■ We turn now to examine § 1983 and determine whether a reasonable jury, viewing the evidence presented in Ms. Frazier's favor, could return a verdict against SEPTA. Section 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights,

---

**3.** This is not to state that Ms. Frazier was silent on the issue of whether she believed that she was being monitored, however. Indeed, she testified that her body had been prepped by various bugging devices so that her activities could be charted. From her March 14, 1995 deposition:

Q. Did you see anybody watching you or observing you today?
A. I don't have to see them.
Q. Why not?
A. Because I feel them, the equipment that follows me. They could not follow me unless they were seeing with the equipment.
Q. Did you see any equipment today?
A. I don't ever see any equipment. I have the results of it in my body.
Q. Have you ever seen any equipment following you?
A. I don't know what you mean.
Q. Well, what do you mean by equipment?
A. I mean my body's been prepped in the doctor's office and from my research, they used equipment, acoustics pulse, ELF, lasers, ELF emitters, I can't even begin to estimate, and attacked my body with it so they can pull up on the monitor, the satellite.
Q. Who is they that's doing this?
A. I don't know, but it didn't happen until after the [April 17, 1985 SEPTA bus] accident. Plaintiff's depo. at 21–22. Moreover, Ms. Frazier testified as to the presence of a red van parked outside the Corinthian Street address, but there is no evidence to suggest that the van belonged to Gettier. *Id.* at 47–49.

**4.** We can reject the significance of this evidence summarily. In the first instance, there is no evidence to suggest Gettier supervisors adopted the investigators' recommendations or that the doctor visits were "set up" so that surveillance could begin. At any rate, Ms. Frazier does not cite to any authority, and we know of none, holding that the alleged activity amounts to a constitutional violation.

privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983 (1994). To prevail on a § 1983 claim, a plaintiff must clear two hurdles. First, she must demonstrate some deprivation of a right secured to her by the Constitution or federal law. Further, she must show that the alleged deprivation was committed by a person acting under color of state law. *Moore v. Tartler*, 986 F.2d 682, 685 (3d Cir.1993); *Mastromatteo v. Simock*, 866 F.Supp. 853, 856 (E.D.Pa.1994).

The parties do not dispute that SEPTA, as a state agency, acted under color of state law. Our inquiry is thus confined to the issue of whether SEPTA's activities deprived Ms. Frazier of some federally-protected right. In defense of the instant motion, Ms. Frazier argues that the surveillance activities operated to deprive her of (1) her right of access to the courts guaranteed by the First Amendment, the Due Process Clause and/or the Privileges and Immunities Clause; (2) the right of privacy under the Fourth Amendment as recognized in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); and (3) the right of privacy under the First, Third, Fourth, Fifth and Ninth Amendments as recognized in *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). These contentions will be addressed in turn.

1. *Right of Access to the Courts*

Our Court of Appeals has recognized that "an individual's constitutional right of access to the courts is well settled." *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir. 1990), *cert. denied*, 501 U.S. 1218, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991). Indeed, this Court has described it as a "fundamental" right, one which springs from the Privileges and Immunities Clauses of Article IV and the Fourteenth Amendment, the First Amendment right to petition the government for redress of grievances, and the Due Process Clause. *Agresta v. City of Philadelphia*, 801 F.Supp. 1464, 1472 (E.D.Pa.1992), *aff'd without op.*, 993 F.2d 223 (3d Cir.1993). Al-

though the record reflects that Ms. Frazier has enjoyed an unfettered and extensive right of access to the courts over the course of the last eight years, she nonetheless seeks compensation on the grounds that SEPTA attempted to deny her the right to seek judicial redress.

Her theory is as follows. SEPTA had knowledge that Ms. Frazier's mental cohesiveness was suspect. Thus, it initiated and executed a campaign of "massive" surveillance in an effort to render her incompetent to testify at trial and to punish her for bringing the action against SEPTA. The first difficulty we have with Ms. Frazier's argument is her concession that her right to access to the courts was never deprived by the surveillance. From her brief: "In their (sic) *attempt* to surveil Plaintiff into incompetency, SEPTA has violated and interfered with Plaintiff's constitutional right of access to the courts." Plaintiff's Br. at 20–21 (emphasis added). Thus, Ms. Frazier appears to base her argument on SEPTA's alleged attempt to deny her access to the courts.

Unfortunately for Ms. Frazier, there can be no § 1983 violation absent some actual deprivation of a federally-protected right. Indeed, the Supreme Court has noted that "a public official is liable under § 1983 only if he *causes* the plaintiff to be subjected to deprivation of his constitutional rights." *Baker v. McCollan*, 443 U.S. 137, 142, 99 S.Ct. 2689, 2693, 61 L.Ed.2d 433 (1979) (quotation omitted). In the context of the right of access to the courts, a plaintiff must show that the actions allegedly depriving her of the right caused her some prejudice. *Williams v. Dark*, 844 F.Supp. 210, 214 (E.D.Pa.1993), *aff'd without op.*, 19 F.3d 645 (3d Cir.1994). Since Ms. Frazier has failed to offer any evidence suggesting that the surveillance either caused a deprivation or interference with her right of access to the courts or prejudiced her ability to proceed in any way, her right of access to the courts-based claim cannot survive the instant motion.

Moreover, even if an attempted deprivation were actionable under § 1983, we conclude that Ms. Frazier has failed to produce a shred of evidence to suggest that SEPTA

**122**

conducted the surveillance operations either for purposes of rendering her incompetent to testify at trial or in retaliation for her initiation of the underlying tort suit in the Court of Common Pleas. On this point, Ms. Frazier points to evidence showing that SEPTA was aware of her mental condition, and that the amount it expended on the surveillance was excessive in view of the potential liability.[5] From these two facts, Ms. Frazier argues that a jury could infer that SEPTA's true motivation in initiating the surveillance was to harass and punish her. Given the facts generated during discovery, however, we conclude that no reasonable jury could draw such an inference.

In support of this conclusion, we first consider the unrebutted evidence suggesting that Ms. Frazier was unaware of any specific surveillance activity while it was ongoing. Ms. Frazier conceded that she never observed anyone watching her, and could not identify any specific time during which she became aware of the presence of the investigators. We further note that the surveillance was conducted in a discrete and unobtrusive manner at all times. The undisputed evidence shows that the investigators observed and videotaped Ms. Frazier only in public places, never penetrating her home. If SEPTA undertook the surveillance operations in an attempt to harass and intimidate the plaintiff, as Ms. Frazier argues, it certainly would have made itself known to her. In light of the evidence presented, therefore, we must conclude that the inference Ms. Frazier would have a jury draw is plainly illogical, and as a result, it cannot support her § 1983 claim.

### 2. Right to Privacy

 As we noted above, Ms. Frazier alleges that SEPTA violated her right to privacy as recognized in both *Katz* and *Griswold.* In *Katz*, the Supreme Court recognized a right to privacy grounded in the Fourth Amendment. Thus, in *California v. Ciraolo,* 476 U.S. 207, 211, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210 (1986), the Court set forth the two-pronged *Katz* analysis as follows: (1) whether the individual has a subjective expectation of privacy in the object of the search; and (2) whether that expectation is reasonable. In the context of a § 1983 right to privacy action, a plaintiff cannot overcome a summary judgment motion unless she can show she has a reasonable expectation of privacy in the object that is the basis of the claim. *PBA Local No. 38 v. Woodbridge Police Dep't,* 832 F.Supp. 808, 818 (D.N.J.1993); *see Bootz v. Childs,* 627 F.Supp. 94, 103 (N.D.Ill.1985) (noting that "surveillance tactics are constitutional so long as they do not intrude on a person's reasonable expectation of privacy").

 In the instant case, the undisputed evidence suggests that Ms. Frazier had no reasonable expectation of privacy in any of the places in which the surveillance occurred. As we have noted, all of the surveillance was conducted outdoors and in public. Although Gettier investigators peered into the porch and placed a paper wedge in the door of the Chestnut Street address, these events occurred two months after Ms. Frazier had been evicted from the premises. Similarly, an investigator entered the Corinthian Street address, but only after Ms. Frazier and Ms. Stringfield had relocated. Thus, she could not have had a subjective expectation of privacy in either residence. Accordingly, we conclude that Ms. Frazier cannot sustain her Fourth Amendment-based § 1983 claim.

Finally, Ms. Frazier asks us to allow her § 1983 claim to proceed to trial on the basis that the surveillance activity amounted to an unconstitutional invasion of her mind. While she fails to point to any specific authority recognizing an individual's right to privacy of the mind, Ms. Frazier contends that such a right can be read into both the *Katz* and *Griswold* lines of right to privacy jurisprudence. Even if we were to recognize some right to privacy of the mind, however, the facts presented do not even remotely suggest that SEPTA has violated any such right in this case. Gettier investigators observed Ms. Frazier discretely on five occasions over the

---

5. SEPTA argues that its potential liability in the underlying suit could have reached $1,000,000, thus making more tenuous the probative value of SEPTA's $43,000 expenditure regarding the surveillance efforts. In light of our conclusion, however, we need not explore this issue further.

course of 18 months. On each occasion, Ms. Frazier was out of doors, in a public area, and unaware of the investigators' presence. There is no evidence from which a jury could reasonably infer that the surveillance conducted was initiated for the purpose of playing on Ms. Frazier's mental frailties. Indeed, nothing in the record suggests that it affected the plaintiff's mental capacity in any way. Ms. Frazier fails utterly to point to any evidence suggesting that SEPTA, by means of the limited and discrete surveillance activity it initiated, somehow "invaded" her mind. Accordingly, this argument, like the others before it, must be rejected.

## III

Ms. Frazier has failed to offer evidence from which a jury might reasonably conclude that SEPTA violated any of her constitutional or other federally-protected rights. Accordingly, we must award summary judgment in favor of SEPTA. An appropriate order follows.

## ORDER

AND NOW, this 27th day of November, 1995, upon consideration of Defendant's Motion for Summary Judgment, and the response thereto, it is hereby ORDERED, for the reasons set forth in the preceding memorandum, that said Motion is GRANTED. This action is hereby DISMISSED WITH PREJUDICE.