OPINION
{¶ 1} The appellant, the State of Ohio, appeals the August 30, 2002 judgment of the Common Pleas Court of Logan County, Ohio, granting the motion to suppress of the appellee, Robert Russell Ratleff.
 {¶ 2} The facts relevant to this appeal are as follows. On April 4, 2002, officers for the Logan County Sheriff's Department arrived at 232 Plumvalley Street in Bellefontaine, Ohio, to execute a felony arrest warrant for Robert Russell Ratleff, which was issued by the Common Pleas Court of Franklin County, Ohio. Upon arriving, Detective Franchie Robinson noticed Ratleff in the backyard of the residence with another man, later identified as Richard Holten. Although Ratleff initially did not respond to the call of his name by Detective Robinson, he quickly acknowledged the detective and was placed under arrest without incident. As the detective was patting down Ratleff, he asked Ratleff who was inside the residence. However, Ratleff responded that he did not know because it was "not [his] place." Surprised by this response, Detective Robinson stated, "You don't live here?" Ratleff once again stated that it was not his place and this time added that he lived at 501 Kennedy. The detective then asked, "Are you sure you don't live here?" Again, Ratleff informed the detective that it was not his place. Ratleff was then placed inside a police cruiser and transported to the Logan County jail.
 {¶ 3} After Ratleff was taken into custody, the officers conducted a protective sweep of the residence, having suspicions that the home was used to sell drugs and that weapons were in the home. Inside the home they discovered Erin Porter and Kim Maxwell. When asked, Porter told the officers that she did not live there. In addition, Porter informed the officers that Ratleff stayed at the residence periodically but that was not his home address. Further, Porter was questioned if the person who lived in the home was there at the time, and she responded, "No." The officers then attempted to further ascertain who was in control of the home. In an effort to do so, Porter was asked who owned the home, to which she replied that Phil Rhea was the homeowner. The officers then attempted to locate Rhea. Soon thereafter, Rhea was contacted by law enforcement and he came to the Plumvalley residence.
 {¶ 4} Rhea informed the officers that he was the owner of the home but that he had sold it to Poppy Dickinson, whom he believed to be Ratleff's girlfriend, through a land contract sale. However, Dickinson was no longer living in the home, and Rhea had no idea where she was. Rhea told the officers that he thought that Ratleff was living there, but when informed by the officers that Ratleff denied living at the Plumvalley residence, Rhea stated that he was not "too sure" that Ratleff lived there. The police then asked Rhea for permission to search the home, and Rhea obliged by signing a consent to search form. During the search, two padlocked bedrooms were discovered and forcefully opened by law enforcement. Both drugs and weapons were discovered in the east padlocked room. At some point after these rooms were opened, Holten informed officers that Porter, Maxwell, and Ratleff lived in the home and that he stayed there on occasion. In addition, Maxwell later told the officers that she and Porter lived there with her children. The police later discovered after their search of the padlocked rooms that the east bedroom belonged to Ratleff.
 {¶ 5} As a result of the search, Ratleff was indicted on one count of possession of drugs, in violation of R.C. 2925.11(A), a felony of the first degree. On July 5, 2002, Ratleff filed a motion to suppress the evidence obtained during the search of the Plumvalley residence on April 4, 2002. A hearing was held on this matter on July 12, 2002, but was continued after only two witnesses provided testimony for reasons not relevant to this appeal. The hearing was resumed on August 21, 2002, and consolidated with the motion to suppress of Erin Porter, who was also charged in connection with this search. Thereafter, on August 30, 2002, the trial court granted the motions to suppress as to both Ratleff and Porter. This appeal followed, and the State now asserts one assignment of error.
 {¶ 6} "The trial court erred in determining that the defendant had standing to assert a Fourth Amendment right in the premises searched."
 {¶ 7} In the case sub judice, the trial court suppressed the evidence based upon what it found to be an erroneous understanding of the law on the part of the officers on the scene. In reaching this conclusion, the trial court found that the officers knew that Rhea was merely the owner under a land contract and had no more control of the home than a landlord would. Thus, the court held that the officers' decision to search the home based upon the consent of the "landlord" was a mistake of law, which would not validate the search.
 {¶ 8} This Court has previously noted that "[t]he determination of a defendant's expectation of privacy in the area searched is the
fundamental basis of standing to raise a Fourth Amendment challenge."State v. Masten (1989), Hancock App. No. 5-88-7, 1989 WL 111983, citingMancusi v. DeForte (1968), 392 U.S. 364; Rakas v. Illinois (1978),439 U.S. 128. Thus, in determining whether Ratleff has standing to challenge the search, we "must focus, first, on the existence of any expectation of privacy" in the home, or more specifically, the padlocked bedroom. Masten, supra (citations omitted). In so doing, "[t]he analysis of whether a person has a constitutionally protected legitimate expectation of privacy involves the two inquiries of whether the individual manifested a subjective expectation of privacy in the object of the search, and whether society is willing to recognize that expectation as reasonable." Masten, supra, citing California v. Ciraolo
(1986), 476 U.S. 207.
 {¶ 9} Here, Ratleff repeatedly denied living in the home or even knowing who was in the home at the time of his arrest. Even when Detective Robinson asked, "Are you sure you don't live here," Ratleff once again denied it was his place. In addition, no one in the home admitted to living there or asserted any type of possessory interest in the Plumvalley residence. Not until the padlocked rooms were entered and the contraband was discovered and taken into evidence, did Porter, Maxwell, or Holten inform the police that they were living there or that the padlocked room belonged to Ratleff.
 {¶ 10} Based upon these facts, we find that even if Ratleff had an expectation of privacy in the padlocked bedroom, he relinquished any such expectation by denying any interest in the home. In fact, rather than assert an interest in the home or the bedroom, Ratleff gave Detective Robinson a different address for where he lived and repeatedly denied that the Plumvalley home was "his place." This Court fails to see how Ratleff could have an expectation of privacy in any part of this residence when his own statements disavowed his interest in the home. Furthermore, any such expectation of privacy on Ratleff's part was not reasonable, given his failure to take precautionary steps to ensure the privacy of this room by simply informing the police that the home was his or that the east padlocked bedroom belonged to him.
 {¶ 11} Moreover, in an attempt to locate someone who had control over the home, the officers used all means available to them under the circumstances. First, they obtained Ratleff's statements that he did not live there and that, in fact, he lived at a different address. Next, they questioned the individuals in the home about whether they lived there. Upon hearing that these individuals did not live in the home, they then asked who owned the home and were given Rhea's name by Porter. The officers then attempted to contact Rhea and ascertain whether he owned the home. Once Rhea arrived, they learned that he was once in a land sale contract with Dickinson regarding the Plumvalley residence but that she had since moved and her whereabouts were unknown. Having made every possible attempt to find the person who had control over the home, the only person who would claim any ownership and/or control of the home was Rhea, who consented to the search. Thus, we expressly find the officers' conduct objectively reasonable under these circumstances and to constitute good faith on the part of the officers in conducting this search. See United States v. Leon (1984), 468 U.S. 897, 919-920; UnitedStates v. Bradford (1996), 78 F.3d 1216, 1222.
 {¶ 12} Finally, the Masten case relied upon by the trial court is distinguishable from the case sub judice. In Masten, the police conducted a search of the defendant's home after obtaining the consent of his wife, who was the sole owner of the residence. However, the focus of their search was a locked file cabinet. Masten, supra. The file cabinet belonged to the defendant for his personal use, and he was the only person with the key. Id. Nevertheless, the police forcibly opened the cabinet with the permission of the defendant's wife. Id. Inside the file cabinet the police found photographs of the defendant's daughter in various sexual positions, which led to a nine-count indictment. Id. This Court held that the defendant had standing to assert a Fourth Amendment challenge to the lawfulness of the search. Id. In so doing, we noted that the cabinet was in his home, was used for his personal use, was kept locked during his absence, and that he retained the keys in his sole possession, all of which constituted a legitimate expectation of privacy in the cabinet. Id.
 {¶ 13} What distinguishes Masten from the present case is thatMasten never denied ownership of the cabinet. In addition, the defendant in Masten was never afforded the opportunity to claim ownership prior to the search unlike Ratleff, who repeatedly denied a possessory interest in the Plumvalley home. Moreover, in Masten, the police were made aware prior to their search of the cabinet that it belonged to the defendant and that he was the only one with a key. However, in this case, the officers made every available attempt to ascertain who owned the home and, based upon Ratleff's own representations as well as the representations of others, had no basis for a reasonable belief that Ratleff had any possessory interest in the Plumvalley residence prior to the search. Thus, Masten is not dispositive of this case.
 {¶ 14} For these reasons, the assignment of error is sustained, and the judgment of the Common Pleas Court of Logan County, Ohio, is reversed and remanded for further proceedings consistent with this opinion.
Judgment reversed and cause remanded.
 WALTERS and CUPP, JJ., concur.