[Cite as *State v. Hopkins*, 2023-Ohio-3585.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

STEPHON A. HOPKINS,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 21 MA 0115**

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 19 CR 19

**BEFORE:**
Cheryl L. Waite, Carol Ann Robb, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Gina DeGenova*, Mahoning County Prosecutor and *Atty. Ralph M. Rivera*, Assistant Prosecutor, 21 West Boardman Street, 6th Floor, Youngstown, Ohio  44503, for Plaintiff-Appellee

*Atty. Lynn A. Maro*, Maro & Schoenike Co., 7081 West Boulevard, Suite 4, Youngstown, Ohio  44512-4362, for Defendant-Appellant.

Dated:  September 29, 2023

---

**WAITE, J.**

{¶1} Appellant Stephon A. Hopkins appeals a December 9, 2021 judgment entry of the Mahoning County Court of Common Pleas convicting him of various offenses stemming from a shooting incident. Appellant challenges several procedural aspects of his case, including the dismissal of an African American potential juror and the trial court's decision to allow the state to call a witness who was expected to plead the Fifth Amendment. Appellant also challenges substantive aspects of the case, including a search issue concerning a key, and the sufficiency of the evidence supporting two of his convictions. For the reasons that follow, Appellant's arguments are without merit and the judgment of the trial court is affirmed.

<u>Factual and Procedural History</u>

{¶2} There are three codefendants in this matter: Appellant, Lorice Moore, and Brian Donlow. Appellant is also known by "Yung Chip" and "Steph Curry." Appellant had at least two Facebook accounts, one in the name of Steph Curry and the other in the name of Yung Chip. There are two victims in this case: Christopher Jackson, Jr. ("C.J.") and Carlos Davis. As a result of the incident, C.J. died and Davis was injured.

{¶3} The incident at issue occurred in the early hours of November 18, 2018. According to testimony from his father, C.J. left the family home sometime around midnight. The father did not know C.J.'s plans for the night but stated that it was not uncommon for him to leave the house around this time.

{¶4} The Facebook account of "Steph Curry" communicated with C.J.'s Facebook account shortly before the shooting through both Facebook messages and phone calls. At 12:07 a.m., a Facebook call was placed from C.J.'s account to Appellant's

account. Although the substance of that conversation is unknown, the call lasted a minute and ten seconds. At 12:36 a.m., Appellant's account placed a call to C.J.'s account for a minute and a half. Then, at 12:59 a.m., Appellant sent C.J. a message stating "Rockford Village." (Trial Tr., p. 793.) Two messages were sent shortly thereafter from Appellant to C.J. stating "13:54" then "1354 BuckeyeCurt." [sic]. (Trial Tr., p. 793.) Then, at 1:04 a.m., C.J.'s account placed two calls to Appellant's account lasting thirty seconds and two minutes and five seconds.

{¶5} Shortly before 2:00 a.m., a car driven by Carlos Davis drove off the road in a residential neighborhood at the intersection of Stewart and Bennington Avenues into a vacant grassy lot where it eventually came to a stop. It appears that just before the car left the road, the three back passengers (Appellant, Moore, and Donlow) opened fire on the driver (Davis) and the front passenger (C.J.). In support of this theory, testimony was adduced that almost all of the shell casings were found in the backseat of the car. An inspection of the exterior of the vehicle revealed no damage consistent with an outside shooter. Further, a bullet lodged in the front window was positioned in a manner that it could only have been fired from inside the car. While C.J. did not manage to escape, Davis was somehow able to exit the vehicle and flee to a nearby house where he hid from the line of sight by crouching behind a partial porch wall. The owner of the house called 911 around 1:56 a.m. to report his intrusion onto the property.

{¶6} Officer Michael Medvec, Jr. was the first to arrive at the scene and located Davis who "looked scared and frightened, hiding." (Trial Tr., p. 466.) Officer Medvec discovered multiple gunshot wounds to the back of Davis' right shoulder. Minutes later, paramedic Thomas Toporcer arrived and examined Davis. Toporcer deemed Davis to

be in critical condition and transported him to the hospital. Officer Medvec later learned of the second victim (C.J.) who was not initially reported but discovered by police officers during their investigation of Davis' injuries.

{¶7} As to C.J., a total of nine gunshots wounds were discovered during an autopsy. The entrance wound for "gunshot A" was above the right ear with an exit wound through his right eye. The trajectory of the bullet was determined to be right to left. The entrance would for "gunshot B" was in the upper back with an exit wound in the upper neck. The trajectory for this bullet was upwards from the right to left. The entrance wound for "gunshot C" was the back of the neck with an exit wound above the right ear. "Gunshots D through F" were described as "cluster wounds," located in close proximity to one another in the back of the neck. Only one of the wounds had an exit wound which was through the left of the jaw. The bullet associated with "gunshot G" entered the upper back with no exit wound. The bullet from "gunshot H" entered the back right shoulder with no exit wound. Finally, the bullet associated with "gunshot I" entered through the left side of the back and settled into or near the left lung. In simpler terms, each of the wounds showed the shots were fired from behind the victim. This comported with investigators' theory that the three men (Appellant, Moore, and Donlow) unexpectedly fired shots at the front passengers from the backseat.

{¶8} It is estimated that the shooting occurred shortly before 2:00 a.m. Witnesses reported seeing two men flee from the area around this time. At 2:12 and 2:13 a.m., the Steph Curry Facebook account sent C.J.'s account three messages. The first message asked "bra wya[?]" (Trial Tr., p. 844). This message was interpreted as brother, where are you at? The second message simply read: "yoo." (Trial Tr., p. 845.) The third,

and final, message read "call me when you are here." (Trial Tr., p. 845.) For perspective, these messages were sent approximately one hour after Appellant sent C.J. the Buckeye Address.

{¶9} At some point, Appellant called Independent Radio Taxi and requested service from 1354 Buckeye to Detroit Avenue. The number given by the caller matched a cell number Appellant later gave law enforcement to contact him during their investigation. The taxi was never dispatched and no further correspondence occurred concerning the taxi company.

{¶10} Davis initially cooperated with investigators. At one point, he contacted investigators and provided them with Appellant's "Yung Chip" Facebook account and indicated that it belonged to one of the shooters. However, as will later be discussed, Davis eventually ceased cooperation and refused to testify at trial.

{¶11} DNA from a major contributor to a mixed sample was recovered from a rear interior and exterior door handle. It was found to be consistent with a DNA sample collected from Moore, with a frequency of occurrence of 1 in 500 million (sample A) and 1 in 1 trillion (Sample B).

{¶12} During a search of the car, officers located a keychain on the backseat floor. The blue rectangular keychain had a single key attached and a device used to clip the keychain to a belt loop. A DNA sample from a major contributor taken from the keychain was consistent with Appellant's DNA sample with a frequency of occurrence of one in one trillion. Later in the investigation, law enforcement obtained a photograph from Appellant's Facebook account showing the keychain hanging from his belt loop. Law enforcement also used the key to unlock Appellant's back door.

{¶13} After his arrest, Appellant was informed during a jailhouse call with an unidentified female that police had located the keychain. He seemed upset by this revelation, and asked the woman to "change that ASAP" (an apparent reference to the lock of his house) and to delete a photograph from his Facebook page depicting him with the keychain hanging from his belt loop.

{¶14} After police obtained the DNA results, several warrants were executed. As already discussed, law enforcement obtained several warrants leading to the Facebook records previously discussed. Law enforcement also conducted a search of Appellant's residence, where they located .380 caliber ammunition associated with a Westchester, which was consistent with that used in the shooting. The ammunition was found in a book bag at Appellant's residence along with papers in his name. Sometime after the search of Appellant's residence, Det. Michael Lambert used the key found in the backseat to unlock and then relock the backdoor of Appellant's residence.

{¶15} On January 10, 2019, Appellant and Moore were jointly indicted on the following counts: aggravated murder, an unclassified felony in violation of R.C. 2903.01(A); one count of murder, an unclassified felony in violation of R.C. 2903.01 (A), (D); one count of attempted aggravated murder, a felony of the first degree in violation of R.C. 2923.02 and 2903.01(A); one count of attempted murder, a felony of the first degree in violation of R.C. 2923.02 and 2903.02(A); and one count of felonious assault, a felony of the second degree in violation of R.C. 2903.11(A)(2), (D). In addition, Appellant was charged with having weapons under a disability, a felony of the third degree in violation of R.C. 2923.13 (A)(2), (B). Each count of the indictment carried an attenuated firearm specification in violation of R.C. 2941.145.

{¶16} At the conclusion of a five-day jury trial, Appellant and Moore were acquitted of aggravated murder and attempted aggravated murder, but convicted on all the remaining charges, including the firearm specifications. Donlow was separately tried and convicted following a bench trial. Donlow and Moore's convictions were previously affirmed by this Court.

{¶17} At sentencing, the court determined that the attempted murder and felonious assault convictions merged. The state elected to proceed to sentence on the attempted murder conviction. The court sentenced Appellant to fifteen years to life in prison for murder, eleven years for attempted murder, and three years for the weapons disability. In addition, the court sentenced Appellant to three years on each of the two firearm specifications to run prior to and consecutive to the remaining charges. The sentences were ordered to run consecutively, for an aggregate total of thirty-five years to life. Appellant's sentence was also ordered to run consecutive to his sentence in an unrelated case (19CR377). It is from this entry that Appellant timely appeals.

<u>ASSIGNMENT OF ERROR NO. 1</u>

The trial court erred in denying Hopkins' motion to suppress because the State conducted a search in violation of the Fourth Amendment to the United States Constitution, Article I, Section 14 of the Ohio Constitution.

{¶18} Appellant argues that the trial court erroneously denied his motion to suppress evidence of the key that Det. Lambert used to unlock the door to his residence, which had been found in the backseat of the car. Appellant claimed this use violated his Fourth Amendment rights. He raises this claim on the fact that Det. Lambert admittedly

went to his house without a warrant or probable cause and successfully used the key to turn the lock on his back door, after unsuccessfully trying the front. The state used the key as evidence connecting Appellant to the crime scene and to implicate him in the shooting.

**{¶19}** The state concedes that Det. Lambert's actions constituted a search. However, the state argues that any intrusion associated with that act was so minimal it did not violate Appellant's Fourth Amendment rights. The state cites to several federal cases holding that the privacy interest in a door lock is so minimal that probable cause or obtaining a warrant is not necessary in order for law enforcement to lawfully unlock a door. The state contends that Det. Lambert had probable cause to believe that the key would unlock the door because Davis had implicated Appellant in the shooting and DNA testing results revealed Appellant as the major contributor to DNA found on the keychain.

**{¶20}** A motion to suppress presents mixed issues of law and fact. *State v. Lake*, 151 Ohio App.3d 378, 2003-Ohio-332, 784 N.E.2d 162, ¶ 12 (7th Dist.), citing *State v. Jedd*, 146 Ohio App.3d 167, 171, 765 N.E.2d 880 (4th Dist.2001). If a trial court's findings of fact are supported by competent credible evidence, an appellate court must accept them. *Id*. The court must then determine whether the trial court's decision met the applicable legal standard. *Id*.

**{¶21}** "The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution secure an individual's right to be free from unreasonable searches and seizures and require warrants to be particular and supported by probable cause." *State v. Telshaw*, 195 Ohio App.3d 596, 2011-Ohio-3373, 961 N.E.2d 223 (7th Dist.), ¶ 12. In order for a search or seizure to be lawful, probable cause must exist and

Case No. 21 MA 0115

the search or seizure must be executed pursuant to a warrant, unless an exception to the warrant requirement exists. *State v. Ward*, 7th Dist. Columbiana No. 10 CO 28, 2011-Ohio-3183, ¶ 33.

**{¶22}** In order to be valid, a search must be supported by a warrant or be based on a recognized exception to the warrant requirement. *State v. Ambrosini*, 7th Dist. Mahoning Nos. 14 MA 155, 14 MA 156, 2015-Ohio-4150, ¶ 8, citing *Katz v. U.S.*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In Ohio, there are seven recognized exceptions to the warrant requirement: (1) a search incident to a lawful arrest; (2) consent; (3) the stop-and-frisk doctrine; (4) hot pursuit; (5) probable cause plus the presence of exigent circumstances; (6) the plain view doctrine; and (7) administrative searches. *State v. McGee*, 2013-Ohio-4165, 996 N.E.2d 1048, ¶ 17 (7th Dist.), citing *State v. Akron Airport Post No. 8975*, 19 Ohio St.3d 49, 51, 482 N.E.2d 606 (1985).

**{¶23}** Again, the state concedes that inserting a key into a locked door in order to identify a suspect amounts to a search for purposes of the Fourth Amendment. This is consistent with recent caselaw. See *United States v. Dixon*, 984 F.3d 814 (9th Cir.2020); *Florida v. Jardines*, 569 U.S. 1, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013); *United States v. Jones*, 565 U.S. 400, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012).

**{¶24}** Appellant raises caselaw regarding curtilage and physical trespass, urging this Court to rely on the general notion of trespass in order to find the search conducted here was unreasonable. However, Appellant must contend with the existing caselaw addressing the precise issue where law enforcement unlocks a door with a key for the purpose of linking a suspect to a residence. Unfortunately for Appellant, such a minor search does not run afoul of the Fourth Amendment.

**{¶25}** On the federal level, this issue has risen in several cases involving both unlocking a car door and a door to a residence. In *Dixon,* the Ninth Circuit held that while law enforcement must have probable cause to believe that a suspect is the owner of or had control over a vehicle, a key can be used to open the door for identification purposes. *Id.* at *523.

**{¶26}** In the Fourth Circuit, the court held that "the discrete act of inserting the key into the lock [of a residence] and discovering whether or not it fit did not offend the Fourth Amendment." *United States v. Moses,* 540 F.3d 263 (4th Cir.2008). See also *United States v. Wheeler,* 3rd Cir. No. 16-3780, 2021 WL 4129731 (Sept. 10 2021), certiorari denied 211 L.Ed. 520, 142 S. Ct. 842 (2022); *United States v. Thompson,* 842 F.3d 1002 (7th Cir.2016); *United States v. Saldago,* 250 F.3d 438 (6th Cir.2002); *United States v. $109,179 in U.S. Currency,* 228 F.3d 1080 (9th Cir.2000); *United States v. Lyons,* 898 F.2d 210 (1st Cir.1990).

**{¶27}** The sole court to decide otherwise is *United States v. Bain,* 874 F.3d 1 (1st Cir.2017). This is due to the fact that the officers in *Bain* went a step further, and conducted a protective sweep of the inside after unlocking the door. *Id.* at *10. Also, unlike the instant case, law enforcement in *Bain* made no attempt to determine which unit in an apartment complex was the suspect's before testing the locks.

**{¶28}** There are two Ohio Appellate Districts that have addressed this issue. See *State v. Israel*, 1st Dist. Hamilton No. C-961006, 1997 WL 598396 (Sept. 26, 1997) and *State v. Semik*, 8th Dist. Cuyahoga No. 51588, 1987 WL 5656 (Jan. 22, 1987). In *Israel*, police arrested a man who lacked proper identification, but gave officers a name associated with an outstanding bench warrant. In an effort to confirm the man's identity,

an officer obtained his keys and used them to unlock, and then immediately relock, the door. Heavily relying on the fact that officers never opened the door, which the court cautioned would have raised Fourth Amendment prohibitions, the court ultimately determined the mere act of turning a key to unlock a door is a minimal intrusion. *Id.* at *5. The court reasoned that, in accordance with caselaw from other states, "the only information that possibly could have been suppressed was that [the appellant's] key fit the lock. Even if the trial court should have suppressed this evidence, we hold that any error was harmless as a matter of law because the information was obtainable through other means." *Id.* at *6.

{¶29} In *Semik,* the Eighth District held that the insertion of a key into a lock does not constitute a search. While this holding is contrary to more recent caselaw, the *Semik* court stated in an alternative holding that even if it were a search, there is no reasonable expectation of privacy in an exposed door lock. *Id.* at *2.

{¶30} Significantly, officers in the instant matter acted to confirm the identity of a suspect. In this case, Det. Lambert already had probable cause to believe the key belonged to Appellant, as his DNA was a major contributor to the sample found on that key, and a photograph on Appellant's Facebook page depicted the keychain hanging from Appellant's belt loop. Similar to *Israel,* Det. Lambert used the key solely to turn the lock and did not push the door open to any degree. Instead, he turned the key again to relock the door.

{¶31} We must also stress that even if Appellant were successful in his arguments regarding a Fourth Amendment violation resulting from this search, he would only be entitled to suppression of testimony from Det. Lambert that the key successfully unlocked

Appellant's door. He cannot, however, overcome the most problematic evidence involving the key: the fact that his DNA was consistent with the major DNA sample on the key, the Facebook photograph of Appellant with the keychain visibly attached to his belt loop, a jail house phone call where he not only admitted to ownership of the key but that its discovery was problematic for his defense, and the fact that once a search warrant was obtained for the house, Appellant's personal identification was located inside during the search.

{¶32} We note that Appellant complains that Det. Lambert acted without any witnesses or without activating his body camera. While best practices would likely involve a second officer or body camera video to confirm the extent of the officer's actions, courts routinely have to rely on the truthfulness of law enforcement and must ultimately make a credibility judgment when an officer testifies about their investigation. Hence, it was not error to rely on the officer's sworn testimony that the search comprised only turning the key inside the lock, and not actually opening the door.

{¶33} Appellant also takes issue with the fact that Det. Lambert did not make sure the door was locked before testing the lock, thus he claims the door could have already been unlocked before he turned the key. However, Det. Lambert testified that he was able to turn the key to unlock and then relock the door, providing evidence that the key did control the lock even if he did not know for certain whether the door was initially locked or not. We also note here, the evidence linking Appellant to this key is so overwhelming that it is questionable whether Det. Lambert even needed to test the key in the lock, but will not second-guess his actions in this regard.

{¶34} Appellant's first assignment of error is without merit and is overruled.

## ASSIGNMENT OF ERROR NO. 2

The trial court abused its discretion and denied Hopkins a fair trial by allowing Carlos Davis to take the stand, and assert his Fifth Amendment rights in the presence of the jury.

**{¶35}** Appellant argues the trial court denied his right to a fair trial by allowing Carlos Davis to take the stand and assert a Fifth Amendment right in the jury's presence. Appellant cites to caselaw standing for the proposition that a party may not call a witness knowing that he or she intends to plead the Fifth Amendment due to the prejudicial effect. Appellant relies on the state's concession in its opening statement that it knew Davis would not testify and suggests the jury could conclude from the state's closing that Davis's refusal to testify could be caused by his fear of testifying against the defendants.

**{¶36}** The state responds that there is no evidence in the record that Davis informed anyone of his intent to assert any Fifth Amendment rights when called to testify. The state asserts that it had informed the court before trial that if Davis did not testify, it would move to another witness and not attempt to admit his prior statements to police via forfeiture by wrongdoing. Regardless, the state contends that Davis had no Fifth Amendment rights to assert, he merely refused to testify.

**{¶37}** "A trial court has discretion to excuse a witness from testifying to protect the witness's privilege against self-incrimination. *State v. Linkous*, 4th Dist. Scioto No. 12CA3517, 2013-Ohio-5853, ¶ 57. Therefore, we review the trial court's decision here for abuse of discretion." *State v. Moore*, 7th Dist. Mahoning No. 22 MA 0013, 2023-Ohio-1000, ¶ 38.

**{¶38}** At the outset, we note that the defense did not object when the state called Davis as a witness at trial. A conversation did occur between the court and the parties, but the sole concern of the defense was whether the state would attempt to introduce Davis's testimony via forfeiture by wrongdoing. Once the state elected not to pursue this avenue, the defense had no continuing objections.

**{¶39}** Each of Appellant's arguments on this issue were also raised in Appellant's codefendant's appeal. In *Moore* these were rejected by this Court. We held:

> Given Davis's refusal to testify at the Donlow trial, the parties and the trial court in this case were on notice that Davis would likely refuse to testify at this trial as well. While the trial court was not required to do so, the better practice in this situation would have been to hold a hearing outside of the jury's presence to determine whether Davis would actually testify in this case. Nonetheless, we cannot conclude the trial court abused its discretion in this matter. The parties brought the potential issue to the court's attention prior to the start of trial. The court addressed it, seemingly to the parties' satisfaction. And when the state called Davis to testify, Appellant did not raise an objection except to the limited issue of a photo lineup.

*Moore*, *supra*, at ¶ 42.

**{¶40}** In addition to our holding in *Moore,* we note that a review of the transcripts demonstrates that both Appellant and Moore's defense counsel used Davis's refusal to testify to their advantage. Both counsel suggested that Davis's refusal to testify may have indicated that he was not necessarily a victim in this matter and feared incriminating

himself. As the defense was able to use Davis's assertion that he maintained some Fifth Amendment rights to attempt to create reasonable doubt. Counsel first raised doubt about Davis's status as a victim, which would negate the charge against both defendants relative to the shooting of Davis. Counsel also was able to raise the question that Davis was actually one of the shooters, thus creating doubt as to whether the two codefendants were involved at all. Although the defense did not ultimately succeed, it was a strong argument that had some chance of success.

**{¶41}** Consistent with *Moore,* Appellant's second assignment of error is without merit and is overruled.

ASSIGNMENT OF ERROR NO. 3

Appellant was denied due process when the trial Judge failed to direct a verdict of acquittal as to attempted murder and felonious assault of Carlos Davis.

**{¶42}** Appellant argues that the court erroneously denied his motion for a directed verdict on the assault and attempted murder charges stemming from Davis's injuries. He contends there is no evidence to show where Davis was shot or that Appellant shot him. Further, although witnesses saw only two suspects flee the scene, three people were convicted in this matter (Appellant, Moore, and Donlow).

**{¶43}** The state argues that three different caliber shell casings were found inside the car, suggesting the presence of three shooters. The state contends that it presented an abundance of evidence demonstrating that Appellant was one of those shooters, including: his DNA on a keychain found in the backseat where investigators located shell

casings, a statement from Davis implicating Appellant, ammunition found at his home matching one of the guns used in the shooting which was found in a bag containing his identification, and evidence from his Facebook accounts.

**{¶44}** In relevant part, Crim.R. 29(A) states:

The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses.

**{¶45}** Sufficiency of the evidence involves a legal question that addresses adequacy. *State v. Pepin-McCaffrey*, 186 Ohio App.3d 548, 2010-Ohio-617, 929 N.E.2d 476 ¶ 49 (7th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "Sufficiency is a term of art meaning that legal standard which is applied to determine whether a case may go to the jury or whether evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Draper*, 7th Dist. Jefferson No. 07 JE 45, 2009-Ohio-1023, ¶ 14, citing *State v. Robinson*, 162 Ohio St. 486, 124 N.E.2d 148 (1955). An appellate court does not determine "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Rucci*, 7th Dist. Mahoning No. 13 MA 34, 2015-Ohio-1882, ¶ 14, citing *State v. Merritt*, 7th Dist. Jefferson No. 09-JE-26, 2011-Ohio-1468, ¶ 34. In other words, did the state present evidence of every element of the charged crime that, if believed, supports conviction.

{¶46} At the onset, it is noted that Appellant challenges only the offenses associated with Carlos Davis, (attempted murder and felonious assault). We also note that the two offenses merged for purposes of sentencing.

{¶47} It is difficult to follow Appellant's arguments, which are limited to one paragraph in his brief. It appears that he is questioning where Davis was shot, who fired at him, and the thoroughness of the investigation.

{¶48} The overarching theme of Appellant's arguments seems to question whether Appellant was present at the scene. The record contains evidence which, if believed, placed Appellant at the crime scene. We begin with the Facebook evidence. The Facebook records for Appellant and one of the victims, C.J., was in communication with Appellant several times that evening. The evidence shows the two men planned to meet shortly before the shooting. While there is no direct evidence about this meeting, there is a great deal of circumstantial evidence that, if believed, demonstrates that Appellant was in the backseat of the car where the shots were fired.

{¶49} First, the state presented Det. Lambert's testimony that Appellant became a suspect when one of the victims, Davis, implicated him. While it is true that Davis stopped cooperating with law enforcement prior to trial and refused to testify, this testimony demonstrated how Appellant became a suspect in this case.

{¶50} Second, a blue, rectangular keychain was found in the backseat where it appears the shots originated. This keychain was shown to have belonged to Appellant. A mixed DNA sample was discovered on the keychain. Like most mixed samples, a major and minor contributor were found. A major contributor to a DNA sample is essentially a stronger profile that, in its most simple terms, overpowers the weaker (minor contributor)

profile. The state advanced the theory that the major contributor was the person who owned the keychain, as that person would have touched the keychain the most, thus this would overpower anyone who used the key less frequently. The major contributor DNA showed Appellant as the source of that sample, with a frequency of occurrence of one in one trillion. For perspective, testimony revealed that the Earth's approximate population is around eight billion people. Hence, it is improbable that the DNA profile of the major contributor of that keychain could be consistent with the DNA profile of more than one person currently living on this planet.

{¶51} While Appellant argues that this keychain, even if his, could have been left in that backseat at any point prior to the shooting, the same could be said for the DNA left in and on the car by Lorice Moore, whose conviction was affirmed. Were we to sustain Appellant's argument, it would essentially negate the ability of not only the state, but any criminal defendant in any case, to present DNA evidence as there is no way to prove at what time the DNA was left on the object or objects tested. Absent unusual circumstances, it would completely discredit the evidentiary value of DNA evidence despite its long acceptance in the criminal justice and forensic science fields. Additionally, at no time did Appellant argue he had misplaced the key or that it had been stolen before the incident, and did not claim the key had been in someone else's possession.

{¶52} The record contains other evidence linking Appellant to this key beyond his DNA. Law enforcement obtained a photograph of Appellant from his Facebook page where the keychain can be seen hanging from his belt loop. This photograph, which was admitted into evidence, is similar to one described by Appellant in a phone call with an

Case No. 21 MA 0115

unidentified woman. He asked her to delete the photograph after learning that law enforcement had discovered the key inside the car.

{¶53} During this call, Appellant immediately became distressed and panicked on learning that police had found his key at the crime scene. He demanded that the woman "change it, ASAP," an apparent reference to changing the locks on the house. This request was made several times during the call. The woman informed him that his lawyers described the discovery as "bad." She also told him that police were attempting to fingerprint the key and he responded, "damn." He asked her "if there was any way around it" to which she responded in the negative. It is abundantly clear that Appellant feared the implication of this discovery.

{¶54} Finally, during the search of Appellant's residence, once a warrant was obtained, investigators located .380 caliber ammunition inside a book bag. Inside that same bag were papers bearing Appellant's name. (Trial Tr., p. 779.) The ammunition was for a Winchester, the same type recovered from the crime scene.

{¶55} While the evidence is largely circumstantial, "[c]ircumstantial evidence and direct evidence inherently possess the same probative value." *State v. Prieto*, 7th Dist. Mahoning No. 15 MA 0200, 2016-Ohio-8480, ¶ 34, citing *In re Washington*, 81 Ohio St.3d 337, 340, 691 N.E.2d 285 (1998); *State v. Jenks*, 61 Ohio St.3d 259, 272-273, 574 N.E.2d 492 (1991), paragraph one of the syllabus. In fact, "[e]vidence supporting the verdict may be found solely through circumstantial evidence." *State v. Smith*, 7th Dist. Belmont No. 06 BE 22, 2008-Ohio-1670, ¶ 49. It is apparent that the jury believed the state's evidence.

{¶56} Moving to the argument that Appellant cannot be specifically determined to be the person who shot Davis, this is irrelevant, as Appellant was charged as both the

principal offender and under a complicity theory. The evidence unquestionably demonstrated that Davis was shot twice as a result of the shooting in which Appellant was a participant. Thus, it is legally of no significance who fired the weapon that injured Davis.

{¶57} Appellant appears to argue that Davis could have been injured by return fire, but there is no evidence that anyone else was present at the scene. It does not appear likely that either C.J. or Davis were armed, as C.J. was killed before he could even attempt to escape the vehicle and Davis appeared too injured to have been physically able to hide a weapon, and no weapons were found along his path which was marked by a blood trail.

{¶58} Appellant next questions the failure of investigators to submit a gunshot residue test that was completed on Davis's hands. The decision not to submit that test was discussed at length in the transcripts. Multiple expert witnesses testified that gunshot residue is typically found on a gunshot victim as a result of being shot. Thus, it is expected that any victim would have gunshot residue on them, rendering the test useless.

{¶59} Appellant's remaining argument is that three people have been convicted for a crime where witnesses saw only two people flee the scene. First and foremost, it is possible witnesses could not see all of the persons who may have fled, here, particularly as this crime occurred shortly before 2:00 a.m. and was surely dark outside. It is also possible the shooters fled in separate directions. We also note that, as Davis also fled from the car, it is apparent that at the very least, three people fled the car that night. The state's position was that the number was four of the five persons originally in the car. In

any event, the jury heard all of this evidence and believed that there were three shooters and that Appellant was involved.

{¶60} As such, Appellant's third assignment of error is without merit and is overruled.

<u>"ASSIGNMENT OF ERROR NO. 4"</u>

Hopkins was Denied Due Process, Trial by an Impartial Jury, and Equal Protection When the Trial Court Permitted the State to Remove a Black Juror Without Sound Cause.

{¶61} In Appellant's brief, he inserted two headings labeled "assignments of error number three," the second of which is assumed to be the fourth assignment of error. The state did not respond to the final assignment, which we have labeled as number four.

{¶62} Appellant challenges the dismissal of one of only three African American potential jurors, claiming that the representation of the jury was heavily representative of Caucasian jurors. Appellant is African American and has argued that the mostly Caucasian jury pool was problematic in many regards. Appellant argues that the state should not have been allowed to dismiss the potential jurors on the basis that his daughter had previously been represented by Appellant's counsel. Appellant urges that that representation took place five years ago. Appellant also notes that the state claimed the potential juror took issue with law enforcement's handling of his daughter's case, and that she was implicated under a conspiracy theory. However, the juror clearly explained that the earlier matter was his daughter's fault, and he could weigh the facts of the instant case as instructed by the judge.

<u>Case No. 21 MA 0115</u>

**{¶63}** We have resolved this issue in *Moore, supra.* In *Moore,* we explained:

The prosecutor was concerned that one of the defendants' attorneys had represented Juror No. 12's daughter in her criminal case. And Juror No. 12 did not initially disclose this information on his questionnaire. Additionally, the prosecutor did not feel that Juror No. 12 had a good reaction to how the Struthers Police had handled his daughter's case. Finally, the prosecutor expressed a concern regarding how Juror No. 12 felt about complicity charges, which were an issue in this case, given his daughter's case.

Because the state put forward a racially neutral explanation for the strike, it was then up to the trial court to decide whether Appellant proved purposeful, racial discrimination by the state. The trial court found here "that the explanation given by the state was reasonable and was clear and was not based on race." (Tr. 250).

*Id.* at ¶ 18-19.

**{¶64}** Accordingly, we held that the trial court's decision was clearly not erroneous. Consistent with *Moore,* Appellant's fourth assignment of error is without merit and is overruled.

Conclusion

**{¶65}** Appellant challenges several procedural aspects of his case, including the dismissal of an African American potential juror and the trial court's decision to allow the state to call a witness expected to plead the Fifth Amendment. Appellant also challenges substantive aspects of the case, including a search issue concerning a key and the

sufficiency of the evidence supporting two of his convictions.  For the reasons provided, Appellant's arguments are without merit and the judgment of the trial court is affirmed.

Robb, J., concurs.

Hanni, J., concurs in judgment only with concurring in judgment only opinion.

Hanni, J., concurs in judgment only, with concurring in judgment only opinion.

{¶66}   I concur in judgment only.  I write separately because I would find that the police conducted an unreasonable search by entering the back of Appellant's property without a search warrant to enter the key into the lock of the back door of his residence.

{¶67}   Police initially executed a search warrant of Appellant's home which yielded minimal results.  Four months later, Detective Lambert returned to Appellant's residence without a search warrant after police found a key on a key chain on the floor in the back of Carlos Davis' car and observed a picture of Appellant on his Facebook account that showed what appeared to be the same key chain on his belt loop.  The key contained Appellant's DNA as a major contributor.

{¶68}   Detective Lambert entered Appellant's property alone and with no body camera, and tried to insert the key into the lock on the front door of Appellant's home.  Having no luck opening the front door, Detective Lambert proceeded to the back of Appellant's residence and inserted the key into one of the locks on the back door of Appellant's home.  He had no warrant.

{¶69}   This key and turning of the lock with the key were presented at trial to link Appellant to the crime scene and implicate him in the shooting.  Appellant's residence apparently contained the same kind of ammunition as that found at the scene.  The key contained Appellant's DNA as a major contributor, but it also contained the DNA of others who were never identified.  Further, Appellant's DNA was not found on or in Davis' vehicle and no one placed Appellant in the car or at the scene on the night in question.  Appellant was also excluded from the DNA that was found on the shell casings at the scene.

Case No. 21 MA 0115

**{¶70}** Appellee concedes that inserting the key was a search, but argues that probable cause to insert the key into the lock was unnecessary because the privacy interest and intrusion were minimal. The majority asserts that "Appellant must contend with the existing caselaw addressing the precise issue where law enforcement unlocks a door with a key for the purpose of linking a suspect to a residence." They cite cases holding that inserting a key into the lock of a home and discovering if it fits does not offend the Fourth Amendment.

**{¶71}** However, I would find that the issue here is whether Detective Lambert was entitled to walk around to the back of Appellant's residence without a search warrant and insert the key into the lock on the back door after unsuccessfully inserting the key into the front door. In *Florida v. Jardines*, 569 U.S. 1, 6, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013), the United States Supreme Court held that the Fourth Amendment protects not only the home, but also the curtilage, which is "the area 'immediately surrounding and associated with the home.'" (citation omitted). The Court explained that the curtilage is " 'intimately linked to the home, both physically and psychologically,' " and is where " 'privacy expectations are most heightened.' " *Id.* at 7, quoting *California v. Ciraolo*, 476 U.S. 207, 213, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986).

**{¶72}** Due to this connection, the Court held that law enforcement officers who enter these protected areas to gather information are restricted by the license, whether express or implied, that a homeowner gives them. *Id.* The Court held that:

> We have accordingly recognized that "the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds." *Breard v.*

*Alexandria*, 341 U.S. 622, 626, 71 S.Ct. 920, 95 L.Ed. 1233 (1951). This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters.[fn omitted]. Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is "no more than any private citizen might do." *Kentucky v. King*, 563 U.S. ——, ——, 131 S.Ct. 1849, 1862, 179 L.Ed.2d 865 (2011).

**{¶73}** Without a warrant and without exigent circumstances, the Supreme Court concluded that allowing a canine officer to explore the area around the defendant's home to find evidence against him went beyond the scope of any license and violated the Fourth Amendment in *Jardines*. *Id.* at 7.

**{¶74}** Applying *Jardines*, I would find that while Detective Lambert was given implicit license to approach the front of Appellant's house, he exceeded the scope of any license by proceeding to the back of Appellant's house to insert the key into the lock on his back door. There were no exigent circumstances supporting a warrantless search. Further, police already had papers identifying Appellant that were retrieved from inside the house with a search warrant, the key with Appellant's DNA on it, the Facebook photograph with the keychain attached to Appellant's belt loop, and the jail house phone call discussing the key. Thus, this warrantless search was unnecessary and unreasonable.

**{¶75}** I would also find that this search was more than a minimal intrusion or minor violation of Appellant's privacy interest. The Court explicitly found in *Jardines* that "privacy expectations are most heightened" in one's home and in its curtilage. The concurring Justices in *Jardines* agreed that not only is a property interest in the home and curtilage protected by the Fourth Amendment, but the heightened privacy interests of a homeowner in his home and curtilage are as well. *Id.* at 13.

**{¶76}** Accordingly, I would find that the police violated Appellant's Fourth Amendment rights by entering the back of Appellant's property to insert the key into the lock on his back door without a search warrant.

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed.  Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**